# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

No. 26-2705

---

**MAYDAY HEALTH** and **NANCY TURBAK BERRY**,

*Plaintiffs-Appellees,*

v.

**LARRY R. RHODEN,** Governor of the State of South Dakota and
**MARTY J. JACKLEY,** Attorney General for the State of South Dakota,
in their official capacities,

*Defendants-Appellants.*

---

## APPELLANT'S MOTION TO STAY PRELIMINARY INJUNCTION

---

Defendants-Appellants Larry R. Rhoden, Governor for the State of South Dakota and Marty J. Jackley, Attorney General for the State of South Dakota, by and through their counsel, file this motion to stay the preliminary injunction entered by the district court in this case. The district court remarkably enjoined a state statute proscribing advertising for and the solicitation/facilitation of abortion-inducing pill purchases within the borders of the State of South Dakota on First Amendment grounds. A stay of this injunction is urgently required because it legalizes trafficking in illegal abortion pills in South Dakota for as long as the injunction is in place.

## DISPOSITION OF STAY MOTION IN THE DISTRICT COURT

Per Fed.R.App.P. 8(a)(1), appellants filed a motion to stay the subject preliminary injunction with the district court. The district court denied the motion.

The district court's denial reiterated its prior findings without addressing the deficiencies in the court's reasoning identified in the motion to stay. R.DOC. 63.

## REASONS FOR GRANTING RELIEF

After *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), restored the regulation of abortion to the states, South Dakota enacted SDCL 22-17-5.1 and -5.3, which prohibit "procur[ing]" or "advertis[ing]" any "article or thing . . . intended for producing an abortion," or "drug, [or] medicine . . . for producing an abortion." Mayday Health operates a website which promotes abortion pill sales in states where the sale and ingestion of such pills is illegal. Mayday also aggressively advertises its website in such states with advertisements on billboards, blimps, airplane banners, roving trucks, gas station placards and any other surface it can commandeer for its messaging. R.DOC. 46/Exhibit C; R.DOC. 16-3.

In early December 2025, Mayday posted this placard at gas stations throughout South Dakota:



R.DOC. 46/Exhibits A, B. At a press conference, Mayday crowed that it was targeting South Dakota for this advertising campaign "due to the state's strict abortion laws." R.DOC. 46/Exhibit B. Mayday's advertisements directed South Dakota consumers to its website at MAYDAY.HEALTH.

When a woman enters the MAYDAY.HEALTH website, there is a large headline on the home page that asks "What do you need?" Below that are four clickable links to choose from, the most prominent being "abortion." R.DOC. 46/Exhibit D.




When a woman clicks on "abortion," she is taken immediately to a new screen that lists five separate abortion pill providers, each of whom Mayday informs the viewer "SHIPS TO ALL 50 STATES." R.DOC. 46/Exhibits E, BB.




If a woman clicks on the links to these abortion drug merchants they are informed that they will prescribe drugs via "telemedicine" and send them to South Dakota. R.DOC. 46/Exhibits K, W. In just two clicks of a mouse, Mayday's website connects women to pill merchants willing to ship abortion pills to "ALL 50 STATES" regardless of the legality under state law.

If a woman is curious if these providers can legally mail abortion drugs into her state, Mayday's FAQ page informs her that "[s]hield laws" protect doctors "in

abortion friendly states who prescribe and send abortion pills to people living in other states that ban . . . abortion." R.DOC. 46/Exhibit E.



FAQs

**How are health care providers able to get me pills?**

Shield laws offer protection for doctors, nurses and other practitioners in abortion-friendly states who prescribe and send abortion pills to people living in other states that ban or severely restrict abortion. In many states, these laws protect prescribers and patient data, helping patients in other states access abortion pills online from the prescribers. For more information on shield law prescribers, visit the Abortion Coalition for Telemedicine.

This artful non-answer fails to inform women in South Dakota that these "shield laws" do not change the fact that the transaction she is about to enter and the abortion she contemplates inducing are illegal under state law, which denies women the choice of whether to have an *illegal* abortion or not.

Mayday's advertising campaign to supply abortion drugs "IN ALL 50 STATES" flagrantly flouts SDCL 22-17-5.1's and -5.3's prohibitions on advertising and procuring drugs for the purpose of producing an abortion in South Dakota. Mayday filed a complaint to have SDCL 22-17-5.1 and -5.3 declared unconstitutional and preliminarily enjoin the application of the statute to its advertising campaign pending trial on the merits. R.DOC. 1, 3. The state exhaustively briefed its arguments against the preliminary injunction. R.DOC. 16, 29. The district court held an evidentiary hearing on the motion on June 23, 2026.

On July 17, 2026, the district court entered an order granting Mayday's request for a preliminary injunction. R.DOC. 51.

## REASONS FOR GRANTING RELIEF

According to the district court, the state's proscription on advertising abortion pills violates Mayday's First Amendment rights. It is inconceivable that a court would enter a similar injunction for any other illegal drug – say methamphetamine – on the ground that pro-methamphetamine advocates have a First Amendment right to advertise and facilitate the sale of such a drug. But the district court's order does just that, creating an abortion pill exception to otherwise staunch First Amendment jurisprudence denying protection to advertising which promotes and facilitates illegal transactions. A court cannot legalize an illegal drug in the name of the First Amendment.

To reach this astonishing result, the district court's order improperly analyzed the exception for speech integral to criminal conduct, improperly "distinguished" away precedent governing the exception, arbitrarily refused to consider relevant and highly probative evidence of Mayday's intent and economic motivation, improperly analyzed and applied the standards applicable to commercial speech, and generally failed to hold Mayday to its burden of proving a likelihood of success on the merits. The district court's order allowed Mayday to carry its burden by viewing all the law and facts in a light most favorable to Mayday, as though Mayday were simply

opposing a summary judgment motion rather than seeking the extraordinary remedy of enjoining a duly enacted state criminal statute. For these reasons, appellants seek an immediate stay of the district court's preliminary injunction order as applied to appellee Mayday Health.[1]

**A. Fed.R.App.P. 8 Standards**

A four part test applies in determining to grant a motion to stay a preliminary injunction pending appeal under Fed.R.App.P. 8: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Brakebill v. Jaeger*, 905 F.3d 553, 556 (8th Cir. 2018). As with a motion for preliminary injunction, the most important factor in a motion to stay is a likelihood of success on the merits together with evidence of irreparable injury. *Brady v. National Football League*, 640 F.3d 785, 789 (8th Cir. 2011). But, in balancing these factors, "[c]lear evidence of irreparable injury should result in a less stringent requirement of certainty of victory." *Brady*, 640 F.3d at 789.

---

[1] Appellants also intend to appeal the district court's ruling and injunction related to appellee Turbak Berry, denial of a spoliation remedy, and other findings and rulings in the subject order but limit their stay request to the most urgent matter of the injunction upon the state's enforcement of its criminal statute as applied to Mayday.

### B. The Balancing of Fed.R.App.P. 8 Factors Weigh in Appellant's Favor

Because of conspicuous flaws in the district court's analysis and reasoning, the balancing of Fed.R.App.P. 8 factors here weigh heavily in appellants' favor.

#### 1. Likelihood of Success on the Merits

"What do you need?" This is the opening line of Mayday's website. If the site user's answer to that question were "methamphetamine," and Mayday then provided a link to a seller willing to ship methamphetamine into South Dakota where it is illegal, there is no credible argument that Mayday had not solicited and facilitated an illegal drug transaction in South Dakota. But, according to the district court's order, when the answer is "abortion pills" Mayday gets to skirt the laws. On this basis alone, appellants are likely to succeed on the merits of an appeal of the district court's preliminary injunction. Appellants' likelihood of success increases when the patent defects in the district court's application of First Amendment standards to Mayday's conduct are considered.

Appellants' opposition to Mayday's motion for preliminary injunction required the district court to consider certain exceptions and defenses to Mayday's position that its "speech" was First Amendment protected. First, the district court had to find that Mayday's "speech" was not integral to criminal solicitation and facilitation of illegal abortion pill sales, in which case Mayday's advertising was entitled to no First Amendment protection whatsoever. Second, assuming it was

proper to find Mayday's "speech" not integral to criminal conduct (which it is not), the district court had to determine if Mayday's speech was commercial, in which case the statute would not have been subject to the heightened scrutiny the district court gave it.

The district court's order breezed past these exceptions and defenses by shutting its eyes to glaring evidence that Mayday's "speech" was integral to criminal solicitation and facilitation of illegal abortion pill sales in South Dakota, and of its essentially commercial nature, finding instead that Mayday's "speech" was entirely non-commercial and protected by the highest level of scrutiny. The district court's reasoning and analysis are facially flawed.

**a. Mayday's "Speech" is Integral to Criminal Conduct**

Despite protections afforded First Amendment speech, speech that proposes an illegal transaction or is in furtherance of a criminal scheme receives no protection. Thus, *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973), held that there was "no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics." As speech integral to an illegal commercial transaction in South Dakota, *i.e.* purchase of abortion pills, Mayday's speech is entirely unprotected. *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949)(speech "used as an essential and inseparable part of a grave offense against an important public law" not protected). Generally speaking, advertising

loses First Amendment protection under the speech integral exception when it crosses the line between "mere advocacy" to "inciting or producing an imminent lawless [trans]action." *Brandenburg v. Ohio,* 395 U.S. 444, 447-449 (1969). The district court failed to properly apply the speech integral exception by (i) turning a blind eye to what Mayday does, (ii) improperly "distinguishing" and not applying authorities adverse to Mayday's speech defense, (iii) refusing to consider damning evidence of Mayday's intent, and (iv) finding Mayday's testimony credible when it is clearly at odds with how its website functions.

**i. Mayday Self-Evidently Solicits and Facilitates Illegal Drug Transactions**

As detailed in defendants' brief in opposition to the preliminary injunction (R.DOC. 16 at 9-12), Mayday's "speech" falls squarely into the speech integral exception because it:

- Offers to procure "what is unlawful to possess" – abortion pills – whether as part of a commercial transaction or not. *United States v. Williams,* 553 U.S. 285, 293, 298 (2008).

- Accompanies its advertising with inducements to transfer abortion drugs from one person to another. *Williams,* 553 U.S. at 295.

- Recommends abortion drug suppliers with the intent of initiating a transfer. *Williams,* 553 U.S. at 300.

- Encourages and induces a violation of the law. *United States v. Hansen,* 599 U.S. 762, 775, 782, 783 (2023).



Appellate Case: 26-2705 Page: 10 Date Filed: 09/02/2026 Entry ID: 5679447

- Intends to bring about a particular unlawful act. *Hansen,* 599 U.S. at 771, 783; *United States v. Arthur,* 160 F.4th 597, 608 (4th Cir. 2025).

- Recommends how (by mail) and when (within a certain number of weeks post-LMP) illegal abortion drug acquisition and ingestion be done. *United States v. Al-Timimi,* 2026 WL 71062, *7-*9 (4th Cir.).

- Furnishes the means for obtaining illegal abortion drugs. *Conant v. Walters,* 309 F.3d 629, 636 (9th Cir. 2002); *Arthur,* 160 F.4th at 608.

As if the evidence of its website were not enough, Mayday's complaint in this very case freely admits that the intent of its "advertising" is to "help" women "terminate pregnancies safely even though they live in places like South Dakota that limit or outlaw abortion." R.DOC. 1 at ¶ 6.

The district court turned a blind eye to evidence that Mayday's "speech" is integral to advertising and procuring abortion pills and abortions in South Dakota on the theory that Mayday is just a middleman who "does not sell, [handle,] dispense, or distribute abortion pills." R.DOC. 51 at 27, 33. Defendants have not claimed that Mayday directly does any of those things; if it did, Mayday would be charged as a principal, not for soliciting and facilitating.

The district court was unmindful of authorities which hold that solicitation and facilitation do not require that Mayday actually "sell, handle, or distribute abortion pills." But this court has consistently held "that neither possession nor an actual sale by a [middleman] need be proved by the government on a charge of . . . aiding and abetting the distribution of drugs." *United States v. Hernandez,* 986 F.2d

234, 238 (8th Cir. 1993). Thus, in *United States v. Jackson,* 482 F.2d 1264, 1267 (8th Cir. 1973), the court affirmed the defendant's conviction for aiding and abetting a cocaine deal when the evidence established the defendant's role in "bringing the buyer and seller together." Also, in *United States v. Anziano,* 606 F.2d 242, 245 (8th Cir. 1979), the court affirmed a middleman-defendant's conviction of aiding and abetting a methamphetamine transaction when the defendant introduced undercover law enforcement buyers to a seller and arranged for the buyers and seller to meet to consummate the transaction. The *Anziano* court ruled that for aiding and abetting it was "not significant that [the defendant] did not personally have the drug in his possession at any time or that the sale was actually consummated by" the seller. *Anziano,* 606 F.2d at 245.

Despite these authorities, the district court held that Mayday does not solicit or facilitate because it allegedly does not "offer to provide" abortion pills, and "does not advocate to incite or promote imminent, unlawful action." R.DOC. 51 at 38. First of all, yes, Mayday does "offer to provide" pills through third-party merchants and does incite and promote illegal pill sales. "What do you need?" is Mayday's offer to help procure abortion pills. Mayday admittedly "exists to provide information about how people can get mail-order abortion pills . . . in all 50 states, regardless of harmful state restrictions." R.DOC. 46/Exhibit BB-0002. In other words, Mayday is a front to advertise abortion pills on behalf of merchants who

cannot lawfully advertise for themselves and connect buyers to sellers. Second, advertising on behalf of, and linking its website to, merchants who ship "TO ALL 50 STATES" deliberately incites and promotes abortion pill sales in states where it is illegal. Mayday connects a buyer with a seller willing to break the law in just two clicks of a mouse. *Jackson,* 482 F.2d 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245.

The district court's order acts like "referring [Mayday site users] to a specific third-party that provides a product" (R.DOC. 51 at 27) is perfectly legitimate. It is only if the "product" is legal, which it is not here. Referring buyers "to a specific third-party that provides a[n illegal] product" is the very definition of aiding and abetting an illegal drug transaction. *Jackson,* 482 F.2d 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245. Thus, defendants are likely to succeed in this appeal strictly on the basis that the district court turned a blind eye to what Mayday admittedly does – facilitate delivery of "abortion pills to people living in other states that ban . . . abortion." R.DOC. 46/Exhibit E; *Jackson,* 482 F.2d 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245. But the district court's reasoning is grossly defective in other ways.

#### ii. The District Court Arbitrarily "Distinguished" and Failed to Apply First Amendment Authorities Adverse to Mayday

As detailed in defendants' brief in opposition to the preliminary injunction (R.DOC. 16 at 12-15), on-point authorities, many cited by Mayday itself, hold that

Mayday's "speech" is not protected. Instead of faithfully following and applying these authorities, the district court took pains to draw meaningless distinctions between them in a way that seems determined to thwart their application to this case.

- ***Pittsburgh Press*** categorically states that there is "no doubt" newspapers and other advertising media can constitutionally be forbidden to publish ads for illegal transactions, such as controlled drugs. 413 U.S. at 388. Yet, the district court found that *Pittsburgh Press* was "not . . . particularly instructive" simply because the statement appears in the context of an equal opportunity decision about the lack of heightened protection afforded gender-segregated employment ads. R.DOC. 51 at 35. This "distinction" is not a sound basis for disregarding *Pittsburgh Press* when its underlying holding – advertising that facilitates illegal activity is not protected – applies equally to Mayday. *Pittsburgh Press*, 413 U.S. at 389. As in *Pittsburgh Press*, Mayday's First Amendment interest "is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press*, 413 U.S. at 389. Thus, *Pittsburgh Press* does not permit the district court to so casually classify Mayday's "speech" as non-integral to criminal activity or non-commercial and subject it to heightened scrutiny as it did.



Appellate Case: 26-2705 Page: 14 Date Filed: 09/02/2026 Entry ID: 5679447

- In the context of a newspaper advertisement by an abortion intermediary just like Mayday, ***Bigelow v. Virginia*** found that the First Amendment does not protect advertising proposing and facilitating an abortion that is illegal in the state where the advertiser is advertising. 421 U.S. 809, 828 (1975). But the district court "distinguished" *Bigelow* away because it did not decide "the precise extent" that states may regulate or prohibit advertising of illegal activity "under *all* circumstances." R.DOC. 51 at 38-39. It was hardly necessary for *Bigelow* to decide "the extent to which constitutional protection" might be afforded in other circumstances when the circumstances of *Bigelow* were directly on point. In the context of abortion advertising, *Bigelow* unequivocally ruled that any such advertising that furthers a criminal abortion in a state where it is illegal, as Mayday's clearly does in South Dakota, is not protected. *Bigelow,* 421 U.S. at 828. Bigelow is also clear that speech like Mayday's is "commercial" in that "it relate[s] to a commodity or service" that is available from out-of-state suppliers. *Bigelow,* 421 U.S. at 828. The circumstances of *Bigelow* and this case are so similar, it is impossible to comprehend the district court's notion that *Bigelow* is "not particularly instructive" here. R.DOC. 51 at 39; *Bigelow,* 421 U.S. at 824-825.



Appellate Case: 26-2705 Page: 15 Date Filed: 09/02/2026 Entry ID: 5679447

- Likewise, ***NIFLA v. James*** does not support Mayday's position that its speech is not integral to criminal conduct. 160 F.4th 360, 374 (2nd Cir. 2025). But the district court found that *James* was not "instructive" because "[t]here [wa]s no language in *James* specifically addressing the legality of abortion reversal pills." R.DOC. 51 at 39. First, if abortion reversal pills were illegal in New York, the *James* court certainly would have mentioned that fact and analyzed the case much differently. Second, Mayday is based in New York and knows full well that abortion reversal pills are legal there and did not argue otherwise at the hearing. Yet, the district court *sua sponte* questioned whether abortion reversal pills are legal in New York even though Mayday itself had not. To find Mayday's speech *James*-protected when abortion reversal pills were not illegal in New York – meaning the speech in *James* was not even arguably integral to criminal conduct – reads *James* far too favorably to Mayday's benefit.

To so lightly "distinguish" these and other on-point authorities away – like *Matsumoto* and *Welty* (R.DOC. 16 at 13-15) – does not square with a proper application of First Amendment law or holding Mayday to its burden of proving a likelihood of success on the merits.

### iii. The District Court Refused to Consider Highly Probative Evidence of Mayday's Intent

At the time of the briefing on Mayday's motion for preliminary injunction, Mayday's website featured a chatbot named Charley. Some time prior to the hearing, Mayday's website also featured a "mail forwarding" page which instructed women how to set up a fake address in a state where abortion pills are legal to receive the pills and then forward them to an address in a state where abortion pills are illegal. R.DOC. 45/Exhibit 29. As detailed in the defendants' briefing in opposition to the preliminary injunction and at trial, Chatbot Charley was a font of false and misleading information and illegal advice. R.DOC. 16, 29; R.DOC. 62 at 121/25-123/6, 135-145. Charley made a classic sales pitch to induce women to buy abortion pills with outrageous statements like "[a]bortion pills are available online in every state thanks to shield laws" and that "[i]t's not a crime in any state for people to get or use abortion pills." R.DOC. 48-1; R.DOC. 46/Exhibits J, L, M, Q, LL, MM, NN.

On the day before the hearing, Mayday deleted (spoliated, actually) Chatbot Charley from its website. Both Chatbot Charley and the "mail forwarding" page were highly probative evidence of Mayday's intent to solicit and facilitate illegal abortion drug sales and abortions in states where they are illegal.

But because both the Charley chatbot and "mail forwarding" features had been deleted at the time of the hearing, the district court pointedly refused to consider this damning evidence of Mayday's intent. R.DOC. 51 at 14, 30 n. 4. The district court

reasoned that the preliminary injunction analysis was "forward looking," restricted to "statements [Mayday] intend[s] to make in the future" not "past speech." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014).

Solicitation and facilitation both require the intent to promote or facilitate the commission of a crime. SDCL 22-4A-1; SDCL 22-3-3. When Mayday's *current* website makes the same offer ("What do you need?") to connect prospective buyers of abortion pills with merchants who illegally deliver "abortion pills to people living in other states that ban . . . abortion" in two clicks of a mouse, the Charley chatbot and "mail forwarding" features are still highly relevant evidence of Mayday's intent to solicit and facilitate illegal abortions. R.DOC. 46/Exhibit K. But the district court just ignored this evidence because it was "past speech." R.DOC. 51 at 14.

In *Jackson, Hernandez* and *Anziano,* the defendants, like Mayday, all tried to revise the history of their involvement in soliciting and facilitating drug sales after the fact. Jackson claimed he only intended to "rip off" the buyers, Anziano claimed he was just a "spectator," and Hernandez claimed he was just there "to party." *Jackson,* 482 F.2d 1266; *Hernandez,* 986 F.2d at 239; *Anziano,* 606 F.2d at 244. But the court in each case found that their past speech spoke louder than their present dissembling. The same is true here. When, except for removing the Charley chatbot and "mail forwarding" instructions, Mayday's website's current core function is unchanged, the district court arbitrarily refused to consider Mayday's "past speech"



Appellate Case: 26-2705 Page: 18 Date Filed: 09/02/2026 Entry ID: 5679447

as evidence that Mayday's present "speech" is integral to soliciting and facilitating criminal conduct.

#### iv. The District Court's Favorable Opinion of Mayday's Credibility Defies the Evidence

The core function of Mayday's website is self-evidently to connect site users to abortion pill merchants willing to illegally ship "TO ALL 50 STATES." Mayday denied this self-evident fact. Mayday claimed that it simply provides "accurate information about abortion pills" to "make it easier to learn that abortion pills exist." The district court found these denials "credible" (R.DOC. 51 at 36) even though they are hardly the whole truth about what Mayday does.

If, consistent with what Mayday's website actually *does,* Mayday had testified honestly and completely that it provides "accurate information about [illegal mail-order purchases of] abortion pills" to "make it easier to learn that [illegal mail-order] abortion pills exist [and who sells them]," then the conclusion that its speech is integral to illegal activity would be inescapable. But the district court did not judge the credibility of what Mayday *said* in comparison to what Mayday *does*. The court just took Mayday's denials at face value.

In truth, Mayday's website provides no "information" about abortion pills in the two-click purchase process other than who "SHIPS [THEM] TO ALL 50 STATES" and what it costs. That is all Mayday's website *does*. The fact that this "conduct . . . incidentally sweep[s] in speech" about Mayday's opinions on abortion

does not render it protected nor its denials of what it *does* credible. *NIFLA v. Becerra,* 585 U.S. 755, 769 (2018).

**b. Mayday's Speech Is Commercial**

Even assuming that Mayday's speech is protected, it is commercial speech that is entitled to only intermediate scrutiny. *Central Hudson Gas & Elec. v. New York*, 447 U.S. 557, 564–65 (1980). While the Court applied the proper factors under *Bolger v. Youngs Drug Prods.*, 463 U.S. 60, 65 (1983), it turned a blind eye to evidence and authority unfavorable to Mayday in doing so.

Mayday's speech is clearly commercial under *Bolger*. There is no dispute that Mayday's website is an advertisement. But the district court would not accept that Mayday's advertising refers to a specific product, again on the flimsy rationale that "Mayday does not sell, handle, or distribute abortion pills." R.DOC. 51 at 27. But the advertisement in *Bigelow* was deemed commercial even though the advertiser, like Mayday, was an intermediary between women and abortion providers who provided no abortion products or services itself. *Bigelow*, 421 U.S. at 826. Moreover, as noted in *Bolger*, advertising which simply "'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger*, 463 U.S. at 68.

Nor would the district court accept that Mayday had an economic motivation for its advertising. As in its speech integral analysis, the district court ignored



Appellate Case: 26-2705 Page: 20 Date Filed: 09/02/2026 Entry ID: 5679447

evidence and "distinguished" away on-point case law to find that Mayday's speech is not economically motivated.

Per *James*, to be non-commercial speech must be simply "informational, without any economic motivation." *James,* 160 F.4th at 375. According to the district court, Mayday's speech is not economically motivated because Mayday (allegedly) does not receive revenues from its advertising on behalf of abortion pill merchants or from those merchants' sales of drugs; but such revenues are not the only forms of economic benefit that can make speech commercial. Donations and fundraising which pay an organization's operating expenses and salaries are an economic benefit and motivator.

Despite the undisputed fact that Mayday is funded almost "entirely" by donations (R.DOC. 46/Exhibit AA), the district court ruled that "there is no evidence that Mayday holds an economic motivation for its advertisements." R.DOC. 51 at 27-28. But, according to *James,* evidence of "capital increase through fundraising" is evidence of "economic benefit" to Mayday. *James,* 160 F.4th at 377. Mayday fundraises and solicits donations off its strident, "dissident" message of delivering abortion pills "TO ALL 50 STATES." These donations pay salaries at Mayday and for all its advertising on billboards, trucks, blimps, airplane banners and gas station placards. Donations which "directly relate to [Mayday's] ability to fundraise and, in

turn, to buy more advertisements" is an economic motivation that this court's order simply ignores. *First Resort, Inc. v. Herrera,* 860 F.3d 1263, 1273 (9th Cir. 2017).

And, contrary to the district court's order, *New York Times v. Sullivan* does not support a lack of economic motivation here because Mayday is pushing an illegal product not simply funding a *lawful* movement message. 376 U.S. 254, 266 (1964). Unlike in *New York Times* and *James,* Mayday cannot demonstrate that its placards or website are purely vehicles for "their moral and religious beliefs, not based on any economic motivation." *James,* 160 F.4th at 375.

If Mayday's speech is properly viewed as commercial, it flunks *Central Hudson's* intermediate scrutiny test: (i) the sale of abortion pills in South Dakota is illegal (this, alone, ends the analysis); (ii) the state's interests in the life, health, and safety of pregnant women and their unborn children and preventing circumvention of its abortion regulations are legitimate and substantial; (iii) shutting down advertising for an illegal transaction directly advances this state interest; and (iv) the statute is narrowly drawn because it does not ban general abortion information, only "purposeful solicitation and facilitation of specific acts known to violate [South Dakota] law." *Central Hudson*, 447 U.S. 557 (1980); *Hansen*, 599 U.S. at 781. If the standards and authorities regarding commercial speech are applied appropriately, defendants are highly likely to succeed on the merits of this appeal.



Appellate Case: 26-2705 Page: 22 Date Filed: 09/02/2026 Entry ID: 5679447

### 2. Irreparable Injury

South Dakotans face immediate and irreparable injuries from the sale of abortion pills during the pendency of the injunction. First, there is the loss of unborn life. Second, there are health consequences to women ingesting abortion pills, including hemorrhaging and infection that may result in serious injury or death. R.DOC. 62 at 177-185; R.DOC. 45/Exhibits EE, FF. Minors, whom Mayday's vendors specifically instruct how to surreptitiously obtain and ingest medical abortions without their parents' knowledge or consent, are especially at risk for adverse reactions. R.DOC. 45/Exhibit Z.

### 3. Substantial Injury to Mayday

A stay causes no actual or substantial injury to Mayday because it does not significantly infringe on Mayday's First Amendment right to advocate on behalf of abortion pills generally. *Bolger*, 463 U.S. at 68. Even with a stay, Mayday "has the full panoply of protections available to its direct comments on public issues." *Bolger*, 463 U.S. at 68. The only component of Mayday's "speech" affected by a stay is its advertising in furtherance of illegal commercial transactions; as observed in *Bolger*, "there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Bolger*, 463 U.S. at 68.

### 4. Public Interest

The state's interest in the life or potential life of the unborn, the health and safety of pregnant women, and promoting respect for human life at all stages of a pregnancy, is well established. *Planned Parenthood v. Casey,* 112 S.Ct. 2791, 2817 (1992); *Gonzales v. Carhart,* 127 S.Ct. 1610, 1626, 1643 (2007). As detailed in defendants' brief in opposition to the preliminary injunction (R.DOC. 16 at 20-24), the flow of abortion pills into the state poses significant health risks to pregnant women and most of all the unborn. While the district court is dismissive of the risks to pregnant women as "astoundingly small" (R.DOC. 51 at 31), it is for the legislature, not a court, to make the judgment call of what risks are acceptable in connection with the availability of medications in the state.

## CONCLUSION

The district court's order unquestioningly accepts Mayday's premise that it merely "provides information." But "providing information" is not *per se* innocent; a person who supplies the schematics to a bank's security system to robbers also has only "provided information" but in doing so he has aided and abetted bank robbery even if he does not participate in the robbery himself or take any of the money. Moreover, Mayday does more than "provide information;" it brokers abortion pill sales on behalf of merchants who are constrained by law from advertising on their own behalf. These actions are not speech but conduct in furtherance of illegal drug



Appellate Case: 26-2705 Page: 24 Date Filed: 09/02/2026 Entry ID: 5679447

transactions. *Jackson,* 482 F.2d 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245.

Defendants are highly likely to succeed on the merits of this appeal because no sustainable ruling can result from the district court's one-sided misapplication of First Amendment standards and selective view of the evidence. Mayday's activities are an irreparable threat to unborn life and maternal health. Defendants accordingly request that this court stay the district court's order preliminarily enjoining SDCL 22-17-5.1 and -5.3.

Dated this 2nd day of September 2026.

Respectfully submitted,

**MARTY J. JACKLEY**
**ATTORNEY GENERAL**

*Paul S. Swedlund*

Paul S. Swedlund
SOLICITOR GENERAL
Amanda J. Miiller
DEPUTY ATTORNEY GENERAL
Jacob R. Dempsey
ASSISTANT ATTORNEY GENERAL
1302 E. Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: 605-773-3215
E-Mail: atgservice@state.sd.us

## CERTIFICATE OF COMPLIANCE

The State of South Dakota, by and through its counsel, Paul S. Swedlund, hereby certifies that this document complies with the type/volume limits of Fed.R.App.P. 32(a)(7)(b) and Fed.R.App.P. 27(d)(2)(A). It contains 5,187 words and complies with the typeface and type style requirements of Fed.R.App.P. 32(a)(5)/(a)(6). It has been printed in a proportionally spaced typeface in 14-point Times New Roman font and scanned for viruses using Symantic Endpoint Protection.

*Paul S. Swedlund*
Paul S. Swedlund
Solicitor General

## CERTIFICATE OF SERVICE

The State of South Dakota, by and through its counsel, Paul S. Swedlund, hereby certifies that the foregoing appellant's motion to stay preliminary injunction was served on appellees' counsel via CM/ECF by electronic filing of the foregoing brief with the clerk of this court this 2nd day of September 2026.

*Paul S. Swedlund*
Paul S. Swedlund
Solicitor General



Appellate Case: 26-2705 Page: 26 Date Filed: 09/02/2026 Entry ID: 5679447