# UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

---

No. 26-2705

---

**MAYDAY HEALTH, NANCY TURBAK BERRY,**

*Plaintiffs/Appellees,*

v.

**GOVERNOR LARRY RHODEN,** in his official capacity, and **ATTORNEY GENERAL MARTY JACKLEY,** in his official capacity,

*Defendants/Appellants.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

---

THE HONORABLE CAMELA C. THEELER
United States District Court Judge

---

**APPELLANTS' BRIEF**

---


MARTY J. JACKLEY
ATTORNEY GENERAL
Paul S. Swedlund
SOLICITOR GENERAL
Amanda J Miiller
DEPUTY ATTORNEY GENERAL
Jacob R. Dempsey
ASSISTANT ATTORNEY GENERAL
1302 E. Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: 605-773-3215
ATTORNEYS FOR APPELLANTS

JAMES D. LEACH
Attorney at Law
1617 Sheridan Lake Road
Rapid City, SD 57701
Telephone: 605-341-4400
ATTORNEY FOR APPELLEES


---

## SUMMARY OF THE CASE

South Dakota enacted SDCL 22-17-5.1 and -5.3, which prohibit "advertis[ing]" in connection with "procur[ing]" any "drug, [or] medicine" or "article or thing . . . intended for producing an abortion." Plaintiffs Mayday Health and Nancy Turbak Berry brought First Amendment challenges to the statutes as facially unconstitutional and as applied to them. APP. 46, R.DOC 1 at 16-17. On July 17, 2026, the district court entered an order preliminarily enjoining enforcement of the statutes against plaintiff Mayday Health as respects its advertising for abortion pills on its website and plaintiff Turbak Berry as respects her wearing of an item of apparel bearing a Mayday.Health message (even though the state conceded that the statutes do not apply to messages worn on items of apparel). APP. 1, R.DOC. 51; R.DOC. 15. Appellants' noticed their appeal on August 3, 2026. R.DOC. 54. Appellants contend on appeal that the speech in question is not protected under the First Amendment on the grounds that it advertises a product that is illegal in South Dakota and/or is speech integral to criminal procurement of abortion under the subject statutes. Alternately, the appellants contend that the speech in question is commercial and so subject to lower-level scrutiny than the district court applied. Because this case involves important questions of state sovereignty and accepted limits on constitutional rights which plaintiff Mayday Health's conduct transgresses, appellants request oral argument of 20 minutes per side.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE AND FACTS ........ 2

SUMMARY OF ARGUMENT ........ 6

STANDARD OF REVIEW ........ 7

ARGUMENT ........ 8

I. The District Court Improperly Enjoined A State Statute Proscribing The Advertisement And Distribution Of Abortion Inducing Pills ........ 9

II. The District Court Incorrectly Found That Plaintiff Turbak Berry Had Standing To Enjoin The Statute As Applied To Her Wearing Of A Sweatshirt Bearing Mayday's Message ........ 41

III. The District Court Incorrectly Denied Defendants A Spoliation Remedy And Use Of Evidence Relevant To Mayday's Intent To Solicit And Facilitate Abortion Drugs In South Dakota ........ 49

CONCLUSION ........ 55

CERTIFICATE OF COMPLIANCE ........ 60

CERTIFICATE OF SERVICE ........ 60

ADDENDUM (District Court Opinion/R.DOC. 51) ........ 1

ADDENDUM (R.DOC. 48-1) ........ 44

## JOINT APPENDIX

**VOLUME 1**

R.DOC. 51 (District Court Opinion) ........ 001

R.DOC. 3 (Plaintiffs' Motion for Preliminary Injunction) ........ 044

R.DOC. 1 (Complaint) ........ 046

R.DOC. 5 (Declaration of Leo Raisner) ........ 066

R.DOC. 6 (Turbak Affidavit) ........ 077

R.DOC. 16 (Defendants' Response to Motion for Preliminary Injunction).........080
R.DOC. 27 (Answer to Complaint)..................................................................221

**VOLUME 2**

R.DOC. 44 (Exhibit List) ..........................................................................228
R.DOC. 45 (Plaintiffs' Exhibits)...................................................................231

**VOLUME 3**

R.DOC. 46 (Defendants' Exhibits) ...............................................................587
R.DOC. 47 (Motion for Spoliation Remedy) ...................................................705
R.DOC. 54 (Defendants' Notice of Appeal) ....................................................706
R.DOC. 58 (Order Granting Motion to Set Deadline) .......................................708

## TABLE OF AUTHORITIES

**Federal Cases**


*Abott v. Perez,* 138 S.Ct. 2305 (2018)....................................................................36

*Alliance for Hippocratic Medicine v. FDA,* 2023 WL 2913725 (5th Cir.)............36

*Auer v. City of Minot,* 896 F.3d 854 (8th Cir. 2018)...............................................54

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977)...............................................18

*Bigelow v. Virginia*, 421 U.S. 809 (1975).............................................18, *passim*

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983)......................30, 31, 35

*Brandenburg v. Ohio,* 395 U.S. 444 (1969)......................................................12, 44

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)..........................................................................................30, 33, 35

*Conant v. Walters,* 309 F.3d 629 (9th Cir. 2002) .................................... 13, 45-48

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)..............................3

*First Resort, Inc. v. Herrera,* 860 F.3d 1263 (9th Cir. 2017) ................................33

*Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490 (1949).........................12, 15

*Gonzales v. Carhart,* 127 S.Ct. 1610 (2007).......................................................36

*Greyhound Bus Lines, Inc. v. Wade,* 485 F.3d 1032 (8th Cir. 2007)....................53

*Harrington v. Strong,* 363 F.Supp.3d 984 (D.Neb. 2019)....................................42

*Hicks v. United States,* 150 U.S. 441 (1893).......................................................43

*Jones v. Hirschbach Motor Lines*, 2022 WL 4354856 (D.S.D. 2022).............52, 55

*Matsumoto v. Labrador,* 122 F.4th 787 (9th Cir. 2024).......................21, 22, 23, 24

*NIFLA v. James,* 160 F.4th 360 (2nd Cir. 2025)...............19, 20, 21, 24, 32, 33, 35

*NIFLA v. Becerra,* 585 U.S. 755 (2018)..............................................................30

*New York Times v. Sullivan,* 376 U.S. 254 (1964)...............................................33

*Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376 (1973)..........................................................................12, 17, 18, 21, 57

*Planned Parenthood v. Casey,* 112 S.Ct. 2791 (1992)........................................36

*South Dakota v. Wayfair,* 585 U.S. 162 (2018) .................................................. 18

*Students for Life v. Jackley,* 746 F.Supp.3d 668 (D.S.D. 2024) ........................... 42

*Susan B. Anthony List v. Driehaus,* 573 U.S. 149 (2014) .................................... 26

*Time Warner Cable of New York City, L.P. v. City of New York*,
943 F.Supp. 1357 (S.D.N.Y. 1996) ................................................................ 34

*United States v. Al-Timimi,* 2026 WL 71062 (4th Cir.) ............................ 13, 46, 48

*United States v. Anziano,* 606 F.2d 242 (8th Cir. 1979) ............... 14-17, 27, 29, 57

*United States v. Arthur,* 160 F.4th 597 (4th Cir. 2025) ................. 13, 44, 47, 48, 49

*United States v. Hansen,* 599 U.S. 762 (2023) ...................... 13, 33, 43, 44, 46, 47

*United States v. Hernandez,* 986 F.2d 234 (8th Cir. 1993) ........... 14-17, 27, 29, 59

*United States v. Jackson,* 482 F.2d 1264 (8th Cir. 1973) ............. 14-17, 27, 29, 59

*United States v. Sineneng-Smith,* 590 U.S. 371 (2020) ....................................... 21

*United States v. Walker,* 60 Fed.Appx 637 (8th Cir. 2003) .................................. 52

*United States v. Williams,* 553 U.S. 285 (2008) .................................... 13, *passim*

*Washington Mercantile Ass'n v. Williams,* 733 F.2d 687 (9th Cir. 1984) ............. 18

*White v. United States*, 959 F.3d 328 (8th Cir. 2020) ......................................... 54

*Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367 (2011) ....................................... 34

**Federal Statute**

18 U.S.C.A. § 1461 ...................................................................................... 36

28 U.S.C. § 1292(a)(1) .................................................................................... 1

**State Statutes**

SDCL 22-3-3 ...................................................................................... 27, 57, 58

SDCL 22-4A-1 .................................................................................. 27, 57, 58

SDCL 22-17-5.1 ............................................................ 2, 5, 41, 43, 51, 57, 58

SDCL 22-17-5.3 ............................................................................... 2, *passim*

**Treatise Cited**

*Telemedicine Under Shield Laws in the US*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION 2025;334;(15):1388-1390.doi:10.1001/jama. 2026.11420........................................................................................................58

**Web Sources Cited**

www.merriam-webster.com/dictionary/advertise..........................................42, 43

U.S. Food and Drug Administration, *Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation,* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last visited December 21, 2025)........................................39

## JURISDICTIONAL STATEMENT

Appellees brought their complaint pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201.[1] The district court had jurisdiction under 28 U.S.C. § 1331. On July 17, 2026, The district court entered a preliminary injunction order on July 17, 2026. APP. 1, R.DOC. 51. Appellants' timely noticed their appeal on August 3, 2026. R.DOC. 54. Per 28 U.S.C. § 1292(a)(1), this court has jurisdiction to hear appeals from interlocutory orders granting a preliminary injunction.

## STATEMENT OF THE ISSUES

THE DISTRICT COURT IMPROPERLY ENJOINED A STATE STATUTE PROSCRIBING THE ADVERTISING AND SALE OF ABORTION-INDUCING PILLS IN SOUTH DAKOTA

*Bigelow v. Virginia*, 421 U.S. 809 (1975)

*Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376 (1973)

*United States v. Williams,* 553 U.S. 285 (2008)

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983)

THE DISTRICT COURT INCORRECTLY FOUND THAT PLAINTIFF TURBAK BERRY HAD STANDING TO ENJOIN THE STATUTE AS APPLIED TO HER WEARING OF A SWEATSHIRT BEARING MAYDAY HEALTH'S MESSAGE

*United States v. Hansen,* 599 U.S. 762 (2023)

*United States v. Williams,* 553 U.S. 285 (2008)

*Conant v. Walters,* 309 F.3d 629 (9th Cir. 2002)

*Students for Life v. Jackley,* 746 F.Supp.3d 668 (D.S.D. 2024)

---

[1] The hearing transcript is located at R.DOC. 62 of the district court record and is referenced herein as TRANSCRIPT followed by the court reporter's assigned page/line of the transcript.

THE DISTRICT COURT INCORRRECTLY DENIED THE DEFENDANTS A SPOLIATION REMEDY AND USE OF EVIDENCE OF MAYDAY'S INTENT TO SOLICIT AND FACILITATE SALES OF ABORTION DRUGS IN SOUTH DAKOTA

*White v. United States*, 959 F.3d 328 (8th Cir. 2020)

*Auer v. City of Minot,* 896 F.3d 854 (8th Cir. 2018)

*Greyhound Bus Lines, Inc. v. Wade,* 485 F.3d 1032 (8th Cir. 2007)

*Jones v. Hirschbach Motor Lines*, 2022 WL 4354856 (D.S.D. 2022)

**STATEMENT OF THE CASE AND FACTS**

After *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), restored the regulation of abortion to the states, South Dakota enacted SDCL 22-17-5.1 and -5.3, which prohibit "procur[ing]" or "advertis[ing]" any "article or thing . . . intended for producing an abortion," or "drug, [or] medicine . . . for producing an abortion." Mayday Health operates a website which promotes abortion pill sales in states where the sale and ingestion of such pills is illegal. Mayday aggressively advertises its website in such states on billboards, blimps, airplane banners, roving trucks, gas station placards and any other surface it can commandeer for its messaging. APP. 594, R.DOC. 45; APP. 203, R.DOC. 16-3. In early December 2025, Mayday posted this placard at gas stations throughout South Dakota:



TRANSCRIPT at 64/12, 66/14; APP. 587, 588, R.DOC. 45. At a press conference, Mayday crowed that it was targeting South Dakota for this advertising campaign "due to the state's strict abortion laws." APP. 590 at 0003, R.DOC. 45. Mayday's advertisements directed South Dakota consumers to its website at MAYDAY.HEALTH.

When a woman enters the MAYDAY.HEALTH website, there is a large headline on the home page that asks "What do you need?" Below that are four clickable links, the most prominent being "abortion." APP. 596, R.DOC. 45.



When a woman clicks on "abortion," she is taken immediately to a new screen that lists five separate abortion pill merchants, each of whom Mayday informs the viewer "SHIPS TO ALL 50 STATES." APP. 603, 621, 655, 658, R.DOC. 45.




These abortion drug merchants inform women that they will prescribe drugs via "a telehealth provider" and send them to South Dakota. APP. 617, 624, R.DOC. 45. In just two clicks of a mouse, Mayday's website connects women to pill merchants willing to ship abortion pills to "ALL 50 STATES" regardless of the legality under state law. APP. 621, 591, 659, R.DOC. 45.

If a woman is curious if these providers can legally mail abortion drugs into her state, Mayday's FAQ page informs her that "[s]hield laws" protect doctors "in abortion friendly states who prescribe and send abortion pills to people living in other states that ban . . . abortion." APP. 605, R.DOC. 45.



FAQs

How are health care providers able to get me pills?

Shield laws offer protection for doctors, nurses and other practitioners in abortion-friendly states who prescribe and send abortion pills to people living in other states that ban or severely restrict abortion. In many states, these laws protect prescribers and patient data, helping patients in other states access abortion pills online from the prescribers. For more information on shield law prescribers, visit the Abortion Coalition for Telemedicine.

This artful non-answer fails to inform women in South Dakota that these "shield laws" do not change the fact that the transaction she is about to enter and the abortion she contemplates inducing are illegal under state law.

Mayday's advertising campaign to supply abortion drugs "IN ALL 50 STATES" regardless of state law flagrantly flouts SDCL 22-17-5.1's and -5.3's prohibitions on advertising and procuring drugs for the purpose of producing an abortion in South Dakota. Mayday filed a complaint to have SDCL 22-17-5.3 declared unconstitutional and to preliminarily enjoin the statute's enforcement against its website advertising campaign pending trial on the merits. APP. 46, 44, R.DOC. 1. The state exhaustively briefed its arguments against the preliminary

injunction. APP. 80, R.DOC. 16, 29. The district court held an evidentiary hearing on the motion on June 23, 2026. On July 17, 2026, the district court entered an order granting Mayday's request for a preliminary injunction. APP. 1, R.DOC. 51.

**SUMMARY OF ARGUMENT**

I. The district court improperly enjoined a state statute proscribing advertising for and distribution of abortion-inducing pills on the ground that the statute violated Mayday Health's First Amendment rights to "provide information" about abortion pills. The district court's ruling failed to appreciate that the First Amendment affords no protection for "speech" that advertises and facilitates illegal drug transactions. The district court failed to correctly apply legal standards, account for evidence unfavorable to Mayday, account for Mayday's active role in soliciting and facilitating illegal abortion drug sales in South Dakota, or hold Mayday to its burden of proving a likelihood of success on the merits. Consequently, the district court abused its discretion in finding that Mayday's "speech" is not integral to criminal conduct and unprotected, or at a minimum commercial and subject to ordinary scrutiny.

II. The district court incorrectly found that plaintiff/appellee Turbak Berry had standing to enjoin the statute as applied to her wearing of a sweatshirt bearing a Mayday message. By its terms, the statute does not reach such passive expression and only criminalizes advertising in furtherance of a transaction.

But the district court ruled there was no difference between passive expression and active expression in furtherance of a commercial transaction. Consequently, the district court grossly erred in finding that the subject sweatshirt was "advertising" within the meaning of the statute.

III. The district court incorrectly ruled that Mayday had not spoliated evidence after it had deleted key portions of its website the day before the trial and then denied admission of the deleted evidence. Mayday deleted the subject evidence from its website on the eve of trial for the express purpose of depriving the defendants of the use of the evidence at the hearing, which has prejudiced the defendants. Consequently, the district court erred in denying the defendants the very mild spoliation sanction of admitting the spoliated evidence into the record.

**STANDARD OF REVIEW**

An appeal from a preliminary injunction is reviewed under an abuse of discretion standard. *W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222-1223 (8th Cir. 1986). Like the district court, this court examines (1) the movant's likelihood of success on the merits, (2) irreparable harm to the movant, (3) the balance of harms to the parties, and (4) the public interest. *Mead Data*, 799 F.2d at 1222-1223.

A trial court abuses its discretion if it applies an improper legal standard, or if it clearly errs with respect any finding of fact or conclusion of law, which "may have affected the ultimate balancing" of the preliminary injunction factors. *Olin Water Services v. Midland Research Laboratories,* 774 F.2d 303, 307 (8th Cir. 1985); *Beber v. NavSav Holdings, LLC*, 140 F.4th 453, 459, 462 (8th Cir. 2025). The imminence of an alleged unlawful prosecution is not alone ground for equitable relief. *Younger v. Harris,* 401 U.S. 37, 46 (1971). Enjoining enforcement of a state criminal statute requires a showing of extraordinary circumstances, such as bad faith, harassment or a statute that is "flagrantly and patently violative of express constitutional prohibitions," which SDCL 22-17-5.3 facially is not. *Younger,* 401 U.S. at 53-54.

**ARGUMENT**

The state appeals from an extraordinary order enjoining a state statute proscribing advertising for and the distribution of abortion-inducing pills within the borders of the State of South Dakota; the injunction legalizes trafficking in a drug that the South Dakota legislature made illegal under a duly enacted state statute. The order also enjoined the statute as applied to plaintiff Nancy Turbak Berry's wearing of a Mayday sweatshirt. Also, the order denied the state the mildest of spoliation remedies after Mayday deleted key evidence from its website the day before trial. The state defendants ask that the order be reversed.

## I. The District Court Improperly Enjoined A State Statute Proscribing The Advertisement And Distribution Of Abortion Drugs

The district court enjoined the enforcement of SDCL 22-17-5.3's proscription on the advertising and distribution of abortion-inducing pills within the borders of the State of South Dakota on the ground that the statute supposedly violates Mayday's First Amendment rights. It is inconceivable that a court would enter a similar injunction for any other illegal drug – say methamphetamine – on the ground that pro-methamphetamine advocates have a First Amendment right to advertise and facilitate the sale of such a drug. But the district court's order does just that, creating an abortion pill exception to otherwise staunch First Amendment jurisprudence denying protection to advertising which promotes and facilitates illegal drug transactions.

### A. The District Court Clearly Abused Its Discretion

The district court abused its discretion in entering the subject preliminary injunction by applying improper standards to the exceptions for advertising illegal products and speech integral to criminal conduct, improperly "distinguishing" away (thereby not applying) controlling United States Supreme Court precedent governing these exceptions, applying an improper prospective standard to highly probative evidence of Mayday's intent and erroneously finding it irrelevant, improperly analyzing and applying the standards applicable to commercial speech, and

generally failing to hold Mayday to its burden of proving a likelihood of success on the merits.

In effect, the district court's order allowed Mayday to carry its burden by viewing the facts and law in a light most favorable to Mayday, as though Mayday were simply opposing a summary judgment motion rather than seeking the extraordinary remedy of enjoining a duly enacted state criminal statute. This comprehensive misapplication of standards, burdens and authorities clearly "affected the ultimate balancing" of the preliminary injunction factors. *Olin Water Services*, 774 F.2d at 307. A proper balancing of preliminary injunction factors here weighs heavily in appellants' favor.

**1. Likelihood of Success on the Merits**

"What do you need?" This is the opening line of Mayday's website. If the site user's answer to that question were "methamphetamine," and Mayday then provided a link to a seller willing to ship methamphetamine into South Dakota where it is illegal, there would be no credible argument that Mayday had not solicited and facilitated an illegal drug transaction in South Dakota. But, according to the district court's order, when the answer is "abortion pills" Mayday gets to skirt the laws. On this basis alone, the district court abused its discretion entering a preliminary injunction in this case. The scale of the district court's abuse of discretion becomes

clearer when the glaring defects in the district court's application of First Amendment standards and precedent to Mayday's conduct are considered.

Appellants' opposition to Mayday's motion for preliminary injunction required the district court to consider certain exceptions and defenses to Mayday's position that its "speech" was First Amendment protected. First, the district court had to determine whether Mayday's "speech" advertised an illegal product and/or was integral to criminal solicitation and facilitation of illegal abortion pill sales, in which case Mayday's advertising was entitled to no First Amendment protection whatsoever. Second, assuming Mayday's "speech" is not integral to criminal conduct (which it certainly is), the district court had to determine if Mayday's speech was commercial, in which case the statute would not have been subject to the heightened scrutiny that the district court gave it.

The district court's order breezed past these exceptions and defenses by brushing aside evidence that Mayday's "speech" clearly advertises an illegal product and is integral to criminal solicitation and facilitation of illegal abortion pill sales in South Dakota, and of its essentially commercial nature, finding instead that Mayday's "speech" was entirely non-commercial and protected by the highest level of scrutiny. No defensible ruling can result from the summary judgement-style examination of the evidence and law and misapplication of First Amendment standards conducted by the district court.

### a. Mayday's "Speech" Advertises an Illegal Product and is Integral to Criminal Acquisitions of that Product

Despite its broad protections, the First Amendment does not protect "speech" that advertises an illegal product or furthers illegal acquisitions of for that product. Thus, *Pittsburgh Press Co. v. Human Relations Comm'n* held that there was "no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics." 413 U.S. 376, 388 (1973). As speech advertising an illegal drug and integral to illegal drug transactions in South Dakota, Mayday's speech is entirely unprotected. *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949)(speech "used as an essential and inseparable part of a grave offense against an important public law" not protected).

Generally speaking, advertising loses First Amendment protection under the speech integral exception when it crosses the line between "mere advocacy" to "inciting or producing an imminent lawless [trans]action." *Brandenburg v. Ohio,* 395 U.S. 444, 447-449 (1969). Mayday's website self-evidently advertises an illegal product and is structured to facilitate imminent lawless acquisitions of that product. The district court failed to properly apply the speech integral exception by (i) not acknowledging what Mayday's website *does*, (ii) improperly "distinguishing" and not applying authorities adverse to Mayday's speech defense, (iii) refusing to consider explicit evidence of Mayday's intent, and (iv) finding Mayday's testimony

that it simply "provides information" credible when it is blatantly at odds with the fact that its website brokers illegal abortion pill sales.

#### i. Mayday Self-Evidently Solicits and Facilitates Illegal Drug Transactions

Mayday's "speech" falls squarely into the speech integral to criminal conduct exception because its website:

- Offers to procure "what is unlawful to possess" – abortion pills – whether as part of a commercial transaction or not. *United States v. Williams,* 553 U.S. 285, 293, 298 (2008).
- Accompanies its advertising with inducements to transfer abortion drugs from one person to another. *Williams,* 553 U.S. at 295.
- Recommends abortion drug suppliers with the intent of initiating a transfer. *Williams,* 553 U.S. at 300.
- Encourages and induces a violation of the law. *United States v. Hansen,* 599 U.S. 762, 775, 782, 783 (2023).
- Intends to bring about a particular unlawful act. *Hansen,* 599 U.S. at 771, 783; *United States v. Arthur,* 160 F.4th 597, 608 (4th Cir. 2025).
- Recommends how (by mail) and when (within a certain number of weeks post-LMP) illegal abortion drug acquisition and ingestion be done. *United States v. Al-Timimi,* 2026 WL 71062, *7-*9 (4th Cir.).
- Furnishes the means for obtaining illegal abortion drugs. *Conant v. Walters,* 309 F.3d 629, 636 (9th Cir. 2002); *Arthur,* 160 F.4th at 608.

As if the evidence of its website were not enough, Mayday's complaint in this very case freely admits that the intent of its "advertising" is to "help" women "terminate

pregnancies safely even though they live in places like South Dakota that limit or outlaw abortion." APP. 48, R.DOC. 1 at ¶ 6.

The district court erroneously reasoned that Mayday's "speech" is not integral to illegal abortion pill transactions on the ground that Mayday is a middleman who does not "sell, handle, or distribute abortion pills." APP. 27, 33, R.DOC. 51 at 27. Defendants have not claimed that Mayday directly does any of those things; if it did, Mayday would be charged as a principal rather than for soliciting and facilitating.

The district court was unmindful of authorities which hold that solicitation and facilitation do not require that Mayday actually "sell, [handle,] dispense, or distribute abortion pills." APP. 27, 33, R.DOC. 51 at 27. But this court has consistently held "that neither possession nor an actual sale by a [middleman] need be proved by the government on a charge of . . . aiding and abetting the distribution of drugs." *United States v. Hernandez,* 986 F.2d 234, 238 (8th Cir. 1993). Thus, in *United States v. Jackson,* 482 F.2d 1264, 1267 (8th Cir. 1973), the court affirmed a middleman-defendant's conviction for aiding and abetting a cocaine deal when the evidence established the defendant's role in "bringing the buyer and seller together." Also, in *United States v. Anziano,* 606 F.2d 242, 245 (8th Cir. 1979), the court affirmed a middleman-defendant's conviction of aiding and abetting a methamphetamine transaction when the defendant introduced undercover law enforcement buyers to a seller and arranged for the buyers and seller to meet to

consummate the transaction. The *Anziano* court ruled that for aiding and abetting it was "not significant that [the defendant] did not personally have the drug in his possession at any time or that the sale was actually consummated by" a third-party seller. *Anziano,* 606 F.2d at 245.

Despite these authorities, the district court held that Mayday does not solicit or facilitate because it allegedly does not "offer to provide" abortion pills, and "does not advocate to incite or promote imminent, unlawful action." APP. 38, R.DOC. 51 at 38. First of all, yes, Mayday does "offer to provide" pills through third-party merchants. "What do you need?" is Mayday's offer to help procure abortion pills. Second, Mayday's offer to connect site users to pill merchants willing to ship "TO ALL 50 STATES" intrinsically incites and promotes illegal pill sales. Mayday admittedly "exists to provide information about how people can get mail-order abortion pills . . . in all 50 states, regardless of harmful state restrictions." APP. 659, R.DOC. 45. In other words, Mayday is a front to advertise abortion pills on behalf of merchants who cannot lawfully advertise for themselves which connects buyers to sellers willing to break the law in just two clicks of a mouse. TRANSCRIPT at 77/21-78/11; *Jackson,* 482 F.2d at 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245. Because these merchants cannot advertise for themselves, Mayday is "an essential and inseparable part of" every abortion pill shipped into South Dakota via any transaction initiated by its website. *Giboney,* 336 U.S. at 502.

To the district court, "referring [Mayday site users] to a specific third-party that provides a product" is perfectly legitimate. APP. 27, R.DOC. 51 at 27. But it is legitimate only if the "product" is legal, which it is not here. Referring buyers "to a specific third-party that provides a[n illegal] product" is the very definition of aiding and abetting an illegal drug transaction. *Jackson,* 482 F.2d at 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245.

The district court's order rests on the erroneous premise that "providing information" is in all cases innocent. But a person who supplies the schematics to a bank's security system to robbers also has only "provided information" but in doing so he has aided and abetted bank robbery even if he does not participate in the robbery himself or take any of the money. Moreover, Mayday does more than "provide information;" it brokers abortion pill sales on behalf of merchants who are constrained by law from advertising on their own behalf. TRANSCRIPT at 78/11, 79/2, 95/5. These actions are not speech but conduct in furtherance of illegal drug transactions. *Jackson,* 482 F.2d at 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245.

Thus, defendants are likely to succeed in this appeal strictly on the basis that the district court paid no mind to what Mayday admittedly *does* – solicit and facilitate delivery of "abortion pills to people living in other states that ban . . . abortion." APP. 605, R.DOC. 45; *Jackson,* 482 F.2d at 1267; *Hernandez,* 986 F.2d

at 238; *Anziano,* 606 F.2d at 245. But the district court's reasoning is grossly defective in other ways.

#### ii. The District Court Arbitrarily "Distinguished" and Failed to Apply First Amendment Authorities Adverse to Mayday

On-point authorities cited by Mayday itself – *Pittsburgh Press, Bigelow, James, Matsumoto* and *Welty* – hold that its "speech" is not protected. Instead of faithfully applying and following these authorities, the district court took pains to draw meaningless distinctions that thwart their application to this case.

*Pittsburgh Press* categorically states that there is "no doubt" newspapers and other advertising media can constitutionally be forbidden to publish ads for illegal drugs. *Pittsburgh Press*, 413 U.S. at 388. Yet, the district court found that *Pittsburgh Press* was "not . . . particularly instructive" simply because the statement appears in the context of an equal opportunity decision about the lack of heightened protection afforded gender-segregated employment ads. APP. 35, R.DOC. 51 at 35. This "distinction" is not a sound basis for disregarding *Pittsburgh Press* when its underlying holding – advertising that facilitates illegal activity is not protected – applies with equal force to Mayday. *Pittsburgh Press*, 413 U.S. at 389. As in *Pittsburgh Press*, Mayday's First Amendment interest "is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity." *Pittsburgh Press*, 413 U.S. at 389. Thus,

*Pittsburgh Press* does not permit the district court to casually classify Mayday's "speech" as non-integral to illegal activity or non-commercial and subject it to heightened scrutiny as it did.

In the context of a newspaper advertisement by an abortion intermediary just like Mayday, *Bigelow* found that the First Amendment does not protect advertising proposing and facilitating an abortion that is illegal in the state where the advertiser is advertising. *Bigelow v. Virginia*, 421 U.S. 809, 828 (1975). *Bigelow* ruled that Virginia, where abortion was illegal, could not enjoin a Virginia newspaper from advertising that abortion was legal in New York. *Bigelow*, 421 U.S. at 824-825. If Mayday's message in South Dakota was simply "abortion is legal in Minnesota and here is a list of Minnesota clinics that perform abortions," then it's speech would be *Bigelow* protected. *Bigelow* protects an "advertiser who proposes a transaction in a state where the transaction is legal." *Washington Mercantile Ass'n v. Williams,* 733 F.2d 687, 691 (9th Cir. 1984). Here, however, Mayday is advertising and facilitating a transaction that is illegal in South Dakota in furtherance of an act that is illegal in South Dakota.[2] *Bigelow* does not protect such conduct. *Bigelow*, 421 U.S. at 828.

---

[2] Products that are "transferred electronically, or services for delivery into South Dakota" are sales consummated within the State of South Dakota and "treated as a local transaction" for jurisdictional purposes. *South Dakota v. Wayfair,* 585 U.S. 162, 177-178 (2018); *Bates v. State Bar of Arizona*, 433 U.S. 350, 378 (1977)(putting up an advertisement is "penetrating a market").

But the district court "distinguished" *Bigelow* away because it did not decide "the precise extent" that states may regulate or prohibit advertising of illegal activity "under *all* circumstances." APP. 38-39, R.DOC. 51 at 38-39. It was hardly necessary for *Bigelow* to decide "the extent to which constitutional protection" might be afforded in all other circumstances when the circumstances of *Bigelow* were directly on point here. In the context of abortion advertising, *Bigelow* unequivocally ruled that any such advertising that furthers a criminal abortion in a state where it is illegal, as Mayday's clearly does in South Dakota, is not protected. *Bigelow,* 421 U.S. at 828. Bigelow is also clear that speech promoting abortion pills like Mayday's is "commercial" because "it relate[s] to a commodity or service" that is available from out-of-state suppliers. *Bigelow,* 421 U.S. at 828. The circumstances of *Bigelow* and this case are so similar that the district court's notion that *Bigelow* is "not particularly instructive" here is incomprehensible. APP. 39, R.DOC. 51 at 39; *Bigelow,* 421 U.S. at 824-825.

Likewise, *NIFLA v. James,* 160 F.4th 360 (2nd Cir. 2025), does not help Mayday's cause here despite some surface similarities. In *James,* the National Institute of Family and Life Advocates (NIFLA) proactively brought suit to enjoin the New York Attorney General from enjoining its advocacy for so-called abortion reversal pills. *James,* 160 F.4th at 365. The *James* court enjoined the Attorney General from preventing NIFLA's referrals to abortion reversal pill providers. But

despite the surface similarities to this case, *James* does not support the imposition of an injunction here.

NIFLA's activities, though similar, were materially different from Mayday's. For one thing – and it is a big thing – the abortion reversal pill is not illegal in New York. For another, the *James* court found that NIFLA's speech was non-commercial because "there [wa]s no evidence in the record . . . to suggest that the NIFLA plaintiffs gain other types of economic benefits by engaging in this speech, such as an increased customer base or a capital increase through fundraising." *James,* 160 F.4th at 377. If Mayday's message were simply about a *legal* medication and it did not fundraise off its illegal advertising, then *James* might be supportive of Mayday's position. *James,* 160 F.4th at 374 (speech that "is an advertisement, makes reference to a specific product, and the speaker has an economic motivation for the communication, is properly characterized as commercial speech").

But the district court found that *James* was not "instructive" because "[t]here [wa]s no language in *James* specifically addressing the legality of abortion reversal pills." APP. 39, R.DOC. 51 at 39. First, if abortion reversal pills were illegal in New York, Letitia James would have simply charged NIFLA with soliciting and facilitating the distribution of an illegal drug rather than bringing a consumer protection action charging NIFLA with deceptively advertising a legal drug. The *James* decision would have analyzed the case *much* differently had an illegal drug

been involved. Second, Mayday is based in New York and knows full well that abortion reversal pills are legal there and did not argue otherwise at the hearing. But, even though courts are to "rely on the parties to frame the issues for decision," the district court *sua sponte* raised a legality argument that Mayday itself did not make. *United States v. Sineneng-Smith,* 590 U.S. 371, 375 (2020). It is not the function of courts to go "looking for wrongs to right" but rather to "decide only questions presented by the parties." *Sineneng-Smith,* 590 U.S. at 376. Mayday did not place the legality of abortion reversal pills in New York in question.

Yet, the district court's order just disregarded *James* over this faux "question" when a Westlaw search would have revealed that abortion reversal pills are legal in New York. To find Mayday's website to be non-commercial, *James*-protected "speech" when abortion reversal pills were not illegal in New York – meaning NIFLA's speech in *James* was not in any way integral to criminal conduct – reads *James* far too favorably to Mayday's benefit.

To so lightly "distinguish" away *Pittsburgh Press, Bigelow* and *James* does not square with the proper application of First Amendment precedent or holding Mayday to its burden of proving a likelihood of success on the merits.

The same is true of the district court's disregard of *Matsumoto v. Labrador,* 122 F.4th 787 (9th Cir. 2024), which Mayday cited as allegedly supportive. But, even more than *Bigelow* and *James*, *Matsumoto* strips Mayday's advertising of any

pretense of legality. *Matsumoto* enjoined an Idaho statute against "recruiting" a minor to obtain an abortion. *Matsumoto,* 122 F.4th at 808. *Matsumoto* entered the injunction because Idaho's statute, in addition to in-state abortions, prohibited "procurement of abortions that are legal [in states] where they are performed." *Matsumoto,* 122 F.4th at 813. Idaho's statute proscribed recruiting a minor to obtain an abortion from an "abortion provider . . . located in another state," which was intended to prevent Idaho minors from obtaining an abortion in neighboring Oregon where abortion is legal. *Matsumoto,* 122 F.4th at 813. In other words, Idaho's statute broadly criminalized speech which *Bigelow* expressly protects, *i.e.* speech concerning legal abortions in other states.

But for a statute like South Dakota's, which is limited to advertisements for procuring or producing an abortion in South Dakota, *Matsumoto* endorsed Idaho's argument that "recruiting an Idaho minor to get an illegal abortion in Idaho qualifies as speech integral to criminal conduct" and that "'recruiting' under [Idaho's statute], to the extent that it induces a minor to violate [that statute] via the adult's procurement of abortion for that minor, would be speech integral to criminal conduct." *Matsumoto,* 122 F.4th at 813. As in *Matsumoto,* Mayday's advertising instructing and facilitating a South Dakota woman on how "to get an illegal abortion in [South Dakota] qualifies as speech integral to criminal conduct." *Matsumoto,* 122 F.4th at 813.

And contrary to Mayday's assertion below that *Welty v. Dunaway,* 791 F.Supp.3d 818, 831, 839 (M.D.Tenn. 2025), is supportive of its position, it is anything but. *Welty* struck down a Tennessee statute against recruiting a minor for an abortion because – like *Matsumoto* and in contravention of *Bigelow* – it also "bar[red] recruitment of minors to facilitate abortions 'regardless' of where the procedure occurs. In other words, the [Tennessee] law prohibit[ed] recruiting an out-of-state abortion that is entirely *legal* in that state." *Welty,* 791 F.Supp.3d at 826. South Dakota's abortion advertising ban does not – unlike Tennessee's (or Idaho's in *Matsumoto*) – extend to advertising the availability of abortion or abortion drugs in states where it is legal. Nor is Mayday's advertising in South Dakota even directed at, or limited to, informing women where it is legal to purchase and ingest abortion pills or otherwise obtain an abortion. Rather, Mayday *admits* that its advertising is directed at "help[ing]" women "terminate pregnancies safely even though they live in places like South Dakota that limit or outlaw abortion." APP. 48, R.DOC. 1 at ¶ 6.

Thus, *Welty*, like *Matsumoto*, holds unequivocally that a "state may constitutionally punish speech made in direct furtherance of in-state abortions." *Welty,* 791 F.Supp.3d at 831. If, unlike Mayday, a pro-abortion group "promote[s] only legal abortions, the speech integral to crime exception does not apply and [the group's] speech remains protected." *Welty,* 791 F.Supp.3d at 831. But if, as here,

the speech promotes illegal abortions, the speech integral exception applies and Mayday's speech is unprotected. *Welty,* 791, F.Supp.3d at 831. Thus, *Welty* supports South Dakota's position that advertising "to procure an illegal abortion [in South Dakota] is speech integral to criminal conduct." *Welty,* 791 F.Supp.3d at 839.

Cases that Mayday itself cited below – *Bigelow, James, Matsumoto, Welty* – affirm that its "speech" advertises an illegal product and is integral to criminal acquisitions of that product. Mayday's advertising "further[s] a criminal scheme in [South Dakota]" in contravention of *Bigelow*. *Bigelow,* 421 U.S. at 828. Mayday is peddling an illegal drug in contravention of *James*. *James,* 160 F.4th at 377. Mayday advertises for the "procurement of abortions that are [il]legal where they are performed." *Matsumoto,* 122 F.4th at 813. Mayday's advertising is "in direct furtherance of in-state abortions." *Welty,* 791 F.Supp.3d at 831. Mayday cannot possibly succeed on the merits of this appeal when the very authorities it cited below - if not "distinguished" away – roundly repudiate its arguments.

#### iii. The District Court Refused to Consider Highly Probative Evidence of Mayday's Intent

At the time of the briefing on Mayday's motion for preliminary injunction, Mayday's website featured a chatbot named Charley. Some time prior to the hearing, Mayday's website also featured a "mail forwarding" page which instructed women how to set up a fake address in a state where abortion pills are legal to receive the pills and then forward them to an address in a state where abortion pills are

illegal. APP. 574, R.DOC. 45. Chatbot Charley was a font of false and misleading information and illegal advice. Charley made a classic sales pitch to induce women to buy abortion pills:

- He identified and promised to solve a problem, *i.e.* "PREGNANT? DON'T WANT TO BE?" APP. 587, 596, R.DOC. 45.
- He offered a simple solution validated by success stories or statistics, *i.e.* telling women abortion pills are "very safe and effective for ending a pregnancy," telling women "it's safe to take pills without seeing a provider first." APP. 614, R.DOC. 45.
- He preempted and overcame objections, *i.e.* telling women that "[a]bortion pills are available online in every state thanks to shield laws," telling women that "[i]t's not a crime in any state for people to get or use abortion pills for themselves before 24 weeks of pregnancy," offering to provide "a link to a telehealth provider to get pills right now," telling women that abortion is "medically safe no matter how far along someone is in their pregnancy," offering to "help [her] choose which type of abortion . . . to get," telling them not to "tell anyone that you took abortion pills, even if you need to visit a medical provider for follow-up care." APP. 617, 618, R.DOC. 45; R.DOC. 48-1/ADDENDUM 44.

- He closed the deal, *i.e.* telling women abortion pills can be "prescribed online and sent in the mail," telling her she can "[g]et abortion pills mailed to your home from a telehealth provider, and take them on your own," offering to "share a link to a website that serves people of all ages," referring her specifically to "Aid Access[, who] ships pills to people in all 50 states for $150 or less." APP. 621, R.DOC. 45.

This brazen hard sell from Mayday's website is irrefutable evidence that the intent of its easy-peasy, handy-dandy, two-click purchase process is to solicit and fulfill abortion pill orders from South Dakota.

On the day before the hearing, Mayday deleted (spoliated, actually) Chatbot Charley from its website. TRANSCRIPT at 143/3. Both Chatbot Charley and the "mail forwarding" page were highly probative evidence of Mayday's intent to solicit and facilitate illegal abortion drug sales and abortions in states where they are illegal.

But because both the Charley chatbot and "mail forwarding" features had been deleted at the time of the hearing, the district court pointedly refused to consider this damning evidence of Mayday's true intent. APP. 14, 30 n. 4, R.DOC. 51 at 14, 30 n. 4. The district court reasoned that the First Amendment analysis was "forward looking," restricted to "statements [Mayday] intend[s] to make in the future" not "past speech." APP. 14, R.DOC. 51 at 14; *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014).

But the speech integral exception requires an examination of whether Mayday's conduct facilitates a violation of state law. Solicitation and facilitation both require the intent to promote or facilitate the commission of a crime. SDCL 22-4A-1; SDCL 22-3-3. When Mayday's *current* website makes and delivers on the same offer ("What do you need?") to connect prospective buyers of abortion pills with merchants who illegally ship "abortion pills to people living in other states that ban . . . abortion" in two clicks of a mouse as it did before the Charley chatbot and "mail forwarding" features were deleted, those features are still relevant evidence of Mayday's present intent to solicit and facilitate illegal abortions. APP. 605, R.DOC. 45; APP. 573, R.DOC. 46. But the district court just ignored this evidence because it was "past speech." APP. 13, R.DOC. 51 at 14.

In *Jackson, Hernandez* and *Anziano,* the intent analysis was not strictly "forward looking." Those defendants, like Mayday, all tried to revise the history of their involvement in soliciting and facilitating drug sales after the fact. Jackson claimed he only intended to "rip off" the buyers, Anziano claimed he was just a "spectator," and Hernandez claimed he was just there "to party." *Jackson,* 482 F.2d at 1266; *Hernandez,* 986 F.2d at 239; *Anziano,* 606 F.2d at 244. But the court in each case found that their past speech spoke louder than their present dissembling. The same is true here. Mayday vociferously denied any intent to induce or encourage women to acquire abortion pills. TRANSCRIPT at 58/21, 59/4, 85/11,

86/2. When, except for deleting the Charley chatbot and "mail forwarding" instructions, Mayday's website's current core function is unchanged, the district court arbitrarily refused to consider Mayday's "past speech" as evidence of its present intent to solicit and facilitate illegal abortion pill transactions.

#### iv. The District Court Clearly Erred In Finding Mayday's Testimony Credible

The core function of Mayday's website is self-evidently to connect site users to abortion pill merchants willing to illegally ship "TO ALL 50 STATES." But Mayday claimed that it simply provides "accurate information about abortion pills" and only "want[s] pregnant women to have . . . reliable, trustworthy information about abortion pills." TRANSCRIPT at 55/17, 102/16. The district court found these bromides about Mayday's activities "credible" (APP. 36, R.DOC. 51 at 36) even though they are less than the whole truth about what Mayday does. Mayday denied that it "induce[s] or cause[s] the transfer of abortion pills," that it "encourage[s] anyone to obtain abortion pills," or that it had any "intent of initiating a transfer of abortion pills." TRANSCRIPT at 58/18, 58/21, 59/3. The district court found these denials "credible" (APP. 36, R.DOC. 51 at 36) even though they blatantly conflict with what Mayday's website *does*.

In truth, on cross-examination Mayday admitted that its website "does more than discuss abortion in general" and "provide information." TRANSCRIPT at 78/11, 79/2, 95/5. According to Mayday itself:

- Its website "connects" site users to "links" that ship abortion pills to states where they are "banned." APP. 591, R.DOC. 45; TRANSCRIPT at 77/21-78/11.
- The "accurate information about abortion" that "it provides [is] direct links to abortion pill providers." TRANSCRIPT at 85/11-15, 87/4.
- The "accurate, reliable information" it provides is "direct links to abortion pill providers." TRANSCRIPT at 93/25-94/3, 96/2.
- Its website provides "direct links" to "five abortion pill providers" who "provide these pills [to Mayday.Health site users] through telemedicine." TRANSCRIPT at 73/25-74/2, 77/14.
- The "reliable, trustworthy information about abortion pills" it wants to impart to site users is the "direct links" to the "trustworthy pill providers" willing to illegally ship pills "TO ALL 50 STATES." TRANSCRIPT at 102/15-22.

"Connect[ing]" buyers with "trustworthy pill providers" willing to illegally supply "abortion pills in states where clinics are banned" is the very definition of aiding and abetting an illegal drug transaction even if Mayday does not personally handle money or distribute pills. APP. 591, R.DOC. 45; *Jackson,* 482 F.2d at 1267; *Hernandez,* 986 F.2d at 238; *Anziano,* 606 F.2d at 245. The ease of accessing these "trustworthy pill providers" through Mayday's links encourages, induces, initiates and causes illegal abortion drug transactions and abortions in South Dakota. But the

district court did not judge the credibility of what Mayday *said* in comparison to the hard evidence of what Mayday's website *does*. The court just accepted Mayday's denials at face value.

In truth, Mayday's website provides no "information" about abortion pills in the two-click purchase process other than who "SHIPS [THEM] TO ALL 50 STATES" and what it costs. That is all Mayday's website *does*. The fact that Mayday's "conduct . . . incidentally sweep[s] in speech" about its opinions on abortion does not render it protected. *NIFLA v. Becerra,* 585 U.S. 755, 769 (2018). Which means that, Mayday actually *is* what its own counsel described facetiously as "a big fake-out, where, actually, [it is] trying to promote women to have abortions, and [it] just decided to say, 'Well, we just want them to have information.'" TRANSCRIPT at 98/21. The district court *clearly* erred in failing to apply the *Jackson/Hernandez/Anziano* standards to Mayday's website and in finding Mayday's denials of what its website plainly *does* credible.

**b. Mayday's Speech Is Commercial**

Even assuming that Mayday's speech is protected, it is commercial speech that is entitled to no more than intermediate scrutiny. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564–65 (1980). While the district court applied the proper factors under *Bolger v. Youngs Drug Prods. Corp.*,

it overlooked evidence and authority adverse to Mayday in doing so. 463 U.S. 60, 65 (1983).

Mayday's speech is clearly commercial under *Bolger*. There is no dispute that Mayday's signs and website are advertisements. TRANSCRIPT at 110/6; APP. 589, R.DOC. 45. But the district court would not accept that Mayday's advertising refers to a specific product, again on the flimsy rationale that "Mayday does not sell, handle, or distribute abortion pills." APP. 27, R.DOC. 51 at 27. But the advertisement in *Bigelow* was deemed commercial even though the advertiser, like Mayday, was an intermediary between women and abortion providers who provided no specific abortion products or services itself. *Bigelow*, 421 U.S. at 826. Moreover, as noted in *Bolger*, advertising which simply "'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech." *Bolger,* 463 U.S. at 68.

Nor would the district court accept that Mayday had an economic motivation for its advertising. As in its speech integral analysis, the district court ignored evidence and "distinguished" away on-point authorities to reach its erroneous finding that "there is no evidence that Mayday holds an economic motivation for its advertisements." APP. 27-28, R.DOC. 51 at 27-28.

According to the district court, Mayday's speech is not economically motivated because Mayday (allegedly) does not receive revenues from its

advertising on behalf of abortion pill merchants or from those merchants' sales of drugs; but, as *James* recognized, such revenues are not the only forms of economic benefit that can make speech commercial. *James,* 160 F.4th at 377.

Per *James*, donations and fundraising which pay an organization's operating expenses and salaries are an economic benefit and motivator. APP. 655, 658, R.DOC. 45. According to Mayday's DONATE page, it is "entirely funded by donations and merchandise sales." APP. 655, R.DOC. 45. Mayday fundraises directly off being an advertising surrogate for abortion pill merchants and its strident, "guerilla" campaign to illegally export abortion to "TO ALL 50 STATES" regardless of state laws. APP. 591, 587, 659, 595, R.DOC. 45. Per *James,* evidence of such "capital increase through fundraising" is evidence of "economic benefit" to Mayday. *James,* 160 F.4th at 377.

These donated funds pay overhead costs and salaries of Mayday's officers and directors which ensures the organization's continued existence, which is a form of economically benefitting from the activities it promotes. TRANSCRIPT at 73/4; *James,* 160 F.4th at 377. These donated funds allow Mayday to "reach more people" with information on "how to access abortion pills through the mail in all 50 states," namely Mayday's "in-your-face" advertising on billboards, trucks, blimps, airplane banners and gas station placards. APP. 594, 621, 655, 659, R.DOC. 45; APP. 203, R.DOC. 16-3. Donations which "directly relate to [Mayday's] ability to fundraise

and, in turn, to buy more advertisements" is an economic motivation that the district court's order simply ignores. *First Resort, Inc. v. Herrera,* 860 F.3d 1263, 1273 (9th Cir. 2017).

And, contrary to the district court's order, *New York Times* does not support a lack of economic motivation here because Mayday is pushing an illegal product not simply funding a *lawful* movement message. *New York Times v. Sullivan,* 376 U.S. 254, 266 (1964). Unlike in *New York Times* and *James,* Mayday cannot demonstrate that its advertising or website are purely "informational, without any economic motivation." *James,* 160 F.4th at 375.

If Mayday's speech is properly viewed as commercial, it flunks *Central Hudson's* intermediate scrutiny test: (i) the sale of abortion pills in South Dakota is illegal (this, alone, ends the analysis); (ii) the state's interests in the life, health, and safety of pregnant women and their unborn children and preventing circumvention of its abortion regulations are legitimate and substantial; (iii) shutting down advertising for an illegal transaction directly advances this state interest; and (iv) the statute is narrowly drawn because it does not ban general abortion information, only "purposeful solicitation and facilitation of specific acts known to violate [South Dakota] law." *Central Hudson,* 447 U.S. at 563; *Hansen*, 599 U.S. at 781. If the standards and authorities regarding commercial speech are applied appropriately,

defendants are highly likely to succeed in establishing that Mayday's speech is commercial.

**2. Balance of Harms Does Not Favor Mayday**

South Dakotans face immediate and irreparable injuries from the sale of abortion pills during the pendency of the injunction. First, there is the loss of unborn life, which the district court took no account of. Second, there are health consequences to women ingesting abortion pills, including hemorrhaging and infection that may result in serious injury or death. APP. 668, 687, R.DOC. 45. Minors, whom Mayday specifically targets and whose "trusted partners" specifically instruct on how to surreptitiously obtain and ingest medical abortions without their parents' knowledge or consent, are especially at risk for adverse reactions. TRANSCRIPT at 132/7, 144/6, 156/12-157/19, 158/8; APP. 653, R.DOC. 45.

While "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Wollschlaeger v. Farmer*, 814 F.Supp.2d 1367, 1383 (S.D.Fla. 2011), this is not true of unprotected speech integral to criminal conduct. Even if speech is protected, courts have clarified that "the assertion of First Amendment rights does not automatically require a finding of irreparable injury." *Time Warner Cable of New York City, L.P. v. City of New York*, 943 F. Supp. 1357, 1384-1385 (S.D.N.Y. 1996). Irreparable harm requires Mayday to "show a chilling effect on free expression." *Time Warner*, 943 F.Supp. at 1384-

1385. But this all presupposes a protected First Amendment interest. Abortion drugs being illegal in South Dakota, "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity . . . . [A state] may ban forms of communication . . . related to illegal activity." *Central Hudson*, 447 U.S. 557 at 563.

Mayday cannot demonstrate irreparable harm for three reasons. First, the advertising of illegal transactions is not entitled to protection in the first place. Second, unlike in *James,* Mayday cannot demonstrate that its advertising and website are purely vehicles for "their moral and religious beliefs, not based on any economic motivation." *James,* 160 F.4th at 375. Third, a stay does not infringe at all on Mayday's First Amendment right to advocate on behalf of abortion pills generally. *Bolger*, 463 U.S. at 68. Even with a stay, Mayday "has the full panoply of protections available to its direct comments on public issues." TRANSCRIPT at 88/18, 89/2, 90/5-20, 91/9-21, 94/12; *Bolger*, 463 U.S. at 68. Mayday also admits that the only component of its "speech" affected by a stay is the component of its advertising "tied to unlawful activity." TRANSCRIPT at 91/2-21, 92/2. As observed in *Bolger*, "there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Bolger*, 463 U.S. at 68. Thus, Mayday cannot claim a First Amendment interest in facilitating illegal commercial transactions and illegal

abortions so it has not suffered the irreparable loss of any expression or activity to which it has any right.

### 3. Balance of Equities/Public Interest Does Not Favor Mayday

The balance of equities here clearly favors the state's interests in the life or potential life of the unborn, the health and safety of pregnant women, and promoting respect for human life at all stages of a pregnancy. *Planned Parenthood v. Casey,* 112 S.Ct. 2791, 2817 (1992); *Gonzales v. Carhart,* 127 S.Ct. 1610, 1626, 1643 (2007). In furtherance of these interests a "state may take measures to ensure that the woman's choice is informed" and adopt policies to encourage women "to choose childbirth over abortion." *Casey,* 112 S.Ct. at 2821, 2825. SDCL 22-17-5.3's advertising ban promotes the state's interests in informing women's abortion decisions and measures to achieve the ends of its pro-life statutes.[3] *Abott v. Perez,* 138 S.Ct. 2305, 2324 n. 17 (2018).

However much Mayday might disagree with South Dakota's pro-life culture, equity never favors illegal communications or conduct. *Alliance for Hippocratic Medicine v. FDA,* 2023 WL 2913725, *20 (5th Cir.)(mail-order abortion pill merchant could claim no "public interest in the perpetuation of illegality"). What Mayday characterizes as a "dissident" and "bold guerilla approach" is just its

[3] SDCL 22-17-5.3 functions as a state-level Comstock Act (18 U.S.C.A. § 1461) with the added intent provisions of *Williams.* The Comstock Act has withstood constitutional challenge for over a century.

euphemism for *illegal* activity. R.DOC. 4 at 32; APP. 595, R.DOC. 45. When Mayday says it acts "regardless of harmful state restrictions," it is a euphemism for *in violation of state laws*. APP. 659, R.DOC. 45. Such advertising is entitled to no protection at all let alone any form of heightened scrutiny.

South Dakota's experience with abortion pill importation evidences that Mayday's abortion pill advertising is a threat to public health. Alpha Center in South Dakota is a non-profit, healthcare facility and clinic that provides pregnancy testing, ultrasounds, and STI testing for pregnant women who are experiencing an unplanned pregnancy. TRANSCRIPT at 193/11. Alpha Center also provides post-abortion care for women who have complications from surgical and medicinal abortion. TRANSCRIPT at 194/2-195/8. At-home, medically unsupervised abortion is not the risk-free procedure Mayday and its affiliates portray it to be. Risks include serious and potentially fatal infections (TRANSCRIPT at 178/20-179/18), life-threatening vaginal bleeding (TRANSCRIPT at 179/19-180/10, 184/6-24), and emergency hysterectomy (TRANSCRIPT at 180/25-181/17).

Therefore, risk assessments are necessary before undergoing a medication abortion because it is vital for patient safety to know blood type, rule out ectopic pregnancy, and confirm fetal age via ultrasound. TRANSCRIPT at 178/3-16, 182/18. Confirming fetal age is necessary because the rate of abortion medication failure or incomplete abortion reaches 38% in the second trimester. TRANSCRIPT

at 180/3, 192/16. Confirming fetal age is also necessary because a fetus is significantly larger at 14 weeks than at 10 weeks and is more difficult to expel, which increases risks associated with retained products of conception. TRANSCRIPT at 192/12, 193/6. Yet, despite these risks the abortion drug merchants hosted on Mayday's website ship pills to women in their second trimester with statements that they can be safely taken up to 14 weeks. TRANSCRIPT at 192/12-16, 193/6. While the district court is dismissive of these risks as "astoundingly small" (APP. 31, R.DOC. 51 at 31), it is for the legislature, not a court, to make the judgment call of what risks are acceptable in connection with the availability of medications in the state.

Since 2024, medication abortion incidents have become increasingly prevalent in South Dakota from women obtaining abortion pills online without appropriate risk assessments and then ingesting the pills at home without proper medical supervision. TRANSCRIPT at 180/15, 184/21, 188/13, 193/11, 194/2, 194/6-195/8, 199/14, 200/12. Alpha Center's experience challenges Mayday's unqualified message that medicinal abortion is safe:

a. One case involved a male who had impregnated a patient and ordered abortion pills online. This individual slipped the pills into the patient's drink without her knowledge. The patient sought abortion pill reversal treatment after ingesting the mifepristone. TRANSCRIPT at 194/6-195/8.

b. In another case, a male ordered abortion pills online on behalf of a patient. This individual entered all the information required by the website and ordered the abortion pills, then gave them to the patient, who took them consensually. The patient sought post-abortion care at Alpha Center due to excessive blood loss. TRANSCRIPT at 194/6-195/8.

c. In another case, a patient purchased abortion pills through Aid Access, a pill merchant hosted on MAYDAY.HEALTH. The pills were sent to the patient's address in South Dakota. The patient contacted Alpha Center with questions about the pills before taking them. After consulting with Alpha Center medical staff, the patient opted not to take the pills. TRANSCRIPT at 195/21.

d. In another case, a minor patient who obtained abortion pills online without parental knowledge or consent took the pills and had to seek emergency medical care due to excessive blood loss. APP. 223, R.DOC.16-2 at ¶ 25.d.

e. In another case, a patient obtained abortion pills from the MAYDAY.HEALTH-hosted provider Aid Access while 15 weeks pregnant. The FDA has not approved abortion pills for safe usage in pregnancies past 10 weeks gestation.[4] This patient ultimately elected to not take the abortion pills. TRANSCRIPT at 195/18.

---

[4] U.S. Food and Drug Administration, *Information About Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation,* https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-

f. In another case, a 12-weeks pregnant patient took abortion pills acquired online and expelled the fetal tissue at home. One of the patient's relatives called with concerns about the patient's excessive blood loss. APP. 224, R.DOC.16-2 at ¶ 25.f.

g. In two cases, patients were told by an abortion pill merchant to falsely report to medical staff that they were experiencing a miscarriage if they needed emergency post-abortion medical care. TRANSCRIPT at 195/24, 191/1; APP. 224, R.DOC.16-2 at ¶ 25.g.

h. In another case, a patient was given instructions by Aid Access to lie and say she was having a miscarriage in the event she sought emergency medical care after taking medicinal abortion pills. TRANSCRIPT at 195/24, 191/1.

These cases show that abortion pills are increasingly being shipped into South Dakota via mail services, and this is made possible due in large part to Mayday's advertising on behalf of the pill merchants. TRANSCRIPT at 198/1, 199/8-19. Of particular concern is Mayday's affiliates' advice to women and teenaged girls to conceal that they have ingested the abortion pill if they need follow-up care for abortion complications. Misrepresenting to a physician that the patient is experiencing a miscarriage when in fact she is having a medical emergency

---

providers/information-about-mifepristone-medical-termination-pregnancy-through-ten-weeks-gestation (last visited December 21, 2025).

secondary to abortion pill ingestion can lead to complications in treatment. TRANSCRIPT at 195/22-196/7; APP. 224, R.DOC.16-2 at ¶ 25.i. In the face of these facts, Mayday cannot claim that the equities or public interest favor its misleading and life-threatening medical advice.

### B. Summary

The district court's repeated misapplication of correct legal standards, summary judgement-style appraisal of the law and evidence, and facially erroneous factual findings, undeniably affected its balancing of the preliminary injunction factors. Defendants accordingly request that this court reverse the district court's order preliminarily enjoining SDCL 22-17-5.1 and -5.3.

## II. The District Court Incorrectly Found That Plaintiff Turbak Berry Had Standing To Enjoin The Statute As Applied To Her Wearing Of A Sweatshirt Bearing Mayday's Message

Plaintiff/appellee Nancy Turbak Berry alleged that SDCL 22-17-5.3 is unconstitutional because she was "deterred from wearing [a Mayday] sweatshirt" bearing a message about the availability of abortion pills "in all 50 states" from Mayday's website address. APP. 60, 61, R.DOC. 1 at ¶¶ 34, 38; APP. 79, R.DOC. 6 at ¶¶ 4, 5. Defendants/appellants moved to dismiss Turbak Berry's claims for lack of standing and for failure to state a claim for which relief may be granted. Fed.R.Civ.P. 12(b)(1), (6). The district court denied the motion to dismiss, found that Turbak Berry had standing, and enjoined the statute as applied to her. The

district court erred in finding that Turbak Berry had standing because SDCL 22-17-5.3 facially does not apply to passive expression like "wearing [a] Mayday Health sweatshirt" bearing a pro-abortion pill message.

Challenges to a statute on First Amendment grounds must be based on "realistic scenarios" that the law will suppress or deter protected expression. *Students for Life v. Jackley,* 746 F.Supp.3d 668, 688 (D.S.D. 2024), quoting *Harrington v. Strong,* 363 F.Supp.3d 984, 1004 (D.Neb. 2019). According to Webster's Dictionary, "advertise" in the general sense means "to make the public aware of (something or someone) especially by means of a published or broadcast notice" and in the transactional sense means "to present (something or oneself) to the public in a way that is intended to attract customers." www.merriam-webster.com/dictionary/advertise. SDCL 22-17-5.3 criminalizes only the latter and not the former.

Turbak Berry's claim rests on the erroneous premise that SDCL 22-17-5.3 uses "advertise" in a general rather than transactional sense. When the context in which a word appears in a statute reflects a specialized as opposed to general meaning, the specialized meaning governs the statute's scope and reach. *United Hansen,* 599 U.S. at 771-773 (applying "encourage" and "induce" as terms of art rather than in a general sense to sustain federal immigration solicitation statute against First Amendment challenge). When interpreting the meaning of the term

"advertises," *Williams* read "the term in [the] context" of a statute which criminalized "offers to provide or requests to obtain" certain virtual child pornography. 553 U.S. at 294-295, 299. In this context, *Williams* defined "advertises" to mean "recommending purported child pornography to another person for his acquisition." *Williams,* 552 U.S. at 294-295.

Here SDCL 22-17-5.1 and -5.3 are limited to "advertis[ing]" in connection with "procur[ing]" abortion "drug[s]" for a woman "for purposes of an unlawful abortion" or "for producing an abortion" in South Dakota. As in *Williams,* "advertise" is used in SDCL 22-17-5.3 in the transactional sense of "attracting customers" or "recommending [abortion pills] to another person for h[er] acquisition." www.merriam-webster.com/dictionary/advertise; *Williams,* 552 U.S. at 294-295. Mayday itself acknowledges that "[a]dvertising involves promoting – proposing a commercial transaction." TRANSCRIPT at 84/20, 92/19.

For criminal liability to attach to mere abortion pill talk, the words must be used with "the intention as respects the effect to be produced." *Hansen,* 599 U.S. at 771, quoting *Hicks v. United States,* 150 U.S. 441, 449 (1893). The "effect" in question here is intent to "procure" pills for a woman to induce an abortion in South Dakota. Unlike Mayday's advertising, Turbak Berry's speech is not connected to procuring pills on behalf of any woman. Because SDCL 22-17-5.3 facially requires more than passive expression to satisfy the requisite criminal scienter, Turbak

Berry's claim that the statute applied to her sweatshirt was not "realistic." *Hansen,* 599 U.S. at 770.

For example, *Arthur* held that informing someone how explosives are made is First Amendment protected, but teaching a person to make explosives *knowing* they intend to use that knowledge to harm someone is not. 160 F.4th 597 at 607. Thus, *Arthur* permits a person to wear a *The Anarchist Cookbook* T-shirt so long as passive advocacy for bomb making stops short of actively instructing someone on how to build a bomb for the purpose of harming someone:




Consistent with *Arthur,* SDCL 22-17-5.3 proscribes only speech that crosses the boundary between "mere advocacy" and "inciting or producing imminent lawless action," which Turbak Berry's sweatshirt does not. *Brandenburg,* 395 U.S. at 447-449. In other words, advocating for abortion pills like Turbak Berry and facilitating

pill transactions for the purpose of an abortion in South Dakota like Mayday are two different things.

When the statute obviously uses "advertise" in a transactional sense, to interpret SDCL 22-17-5.3 as criminalizing Turbak Berry's simple "wearing [of her] Mayday Health sweatshirt" is facially unrealistic. APP. 79, R.DOC. 6 at ¶ 5. Consequently, Turbak Berry lacked standing to challenge the statute and so failed to state a claim as a matter of law.

The district court reasoned that Turbak Berry had standing because it saw no difference between Turbak Berry's sweatshirt and Mayday's website. According to the district court, both carry a "similar . . . message" and both "provide a means to learn more" about abortion pills from Mayday's website. APP. 18, R.DOC. 51 at 18. But applicable case authorities are clear that it is not the "means" to "learn more" that renders speech unprotected in this context, it is speech accompanied by the means to *procure* abortion pills which separates Turbak Berry's sweatshirt from Mayday's website. *Conant,* 309 F.3d at 635.

Thus, according to *Williams,* "[t]o run afoul of [SDCL 22-17-5.3] the speech [must] accompany or seek to induce the transfer of [abortion pills] from one person to another." *Williams,* 552 U.S. at 295. Likewise, *Conant* ruled that the First Amendment protected physicians who recommended marijuana as a palliative to HIV and AIDS patients. 309 F.3d at 635. These "recommendations" did not in any

way enable patients to obtain marijuana. Indeed, *Conant* found the recommendations protected because they were not "intend[ed] for the patient to use . . . as a means for obtaining marijuana, as a prescription is used as a means for a patient to obtain a controlled substance." *Conant,* 309 F.3d at 635. As *Conant* found, if a marijuana use recommendation was a means to obtain marijuana, then "a physician would be guilty of aiding and abetting the violation of federal law." *Conant,* 309 F.3d at 635. But it is not. So, in other words, medical advice to try marijuana is not illegal, but furnishing the means to obtain it is. *Conant,* 309 F.3d at 635. Likewise, in *Al-Timimi*, the court found that Al-Timimi's recruitment speeches, which simply exhorted others to train for *jihad*, were not prosecutable "without any recommendation as to how or when" specific illegal acts might be performed. 2026 WL 71062 at *7-*9.

The district court's reasoning is an abuse of discretion because the court, again, did not subject Turbak Berry's claim to the standards of controlling and on-point authorities like *Hansen, Williams, Conant* and *Al-Timimi.* The district court's ruling does not even mention – or attempt to "distinguish" – these cases in its analysis of Turbak Berry's standing let alone correctly apply them.

As in *Hansen* and *Williams*, the verb "advertise" here cannot be read apart from the transactional context in which it appears. To paraphrase *Williams,* advertise "does not refer to abstract advocacy, such as the statement 'I believe that [abortion

pills] should be legal' or even 'I encourage you to obtain [abortion pills].' It refers to the recommendation of a particular [abortion pill] with the intent of initiating a transfer." *Williams,* 552 U.S. at 300. Turbak Berry's wearing of her sweatshirt, unlike Mayday's website, is not accompanied by the means to initiate the acquisition of abortion pills. *Williams,* 552 U.S. at 295, 300.

By wearing her sweatshirt, Turbak Berry is merely engaging in abstract advocacy. According to Turbak Berry herself, she is not wearing her Mayday sweatshirt to "attract customers" or consummate a woman's "acquisition" of abortion pills for the obvious reason that, as she admits, she is not in the position to sell or supply abortion pills to anyone. *Williams,* 552 U.S. at 294-295; TRANSCRIPT at 34/23, 37/19, 37/21, 40/23, 41/1, 42/3. Turbak Berry admits that, unlike Mayday, she is not trying to "help [women] *get* abortion pills," not engaged in "commercial activity related to abortion pills," not "instruct[ing] anyone how to complete a transaction," not "engaged in any commercial transaction with [abortion] drugs," and is not "facilitating the sale of abortion drugs." *Conant,* 309 F.3d at 635; TRANSCRIPT at 37/22, 40/23, 41/24, 45/3, 45/7.

Turbak Berry's sweatshirt, unlike Mayday's website, does not furnish the means to acquire abortion pills. *Conant,* 309 F.3d at 635; TRANSCRIPT at 37/22, 41/24. Unlike Mayday, Turbak Berry does not connect a woman to a seller or broker a sale. *Arthur,* 160 F.4th 597 at 607; TRANSCRIPT at 41/3, 42/2. Mayday's

website, unlike Turbak Berry and her sweatshirt, does "help [women] get abortion pills" and does "instruct [women] how to complete a transaction." TRANSCRIPT at 37/22, 41/24. As in *Al-Timimi*, Turbak Berry's sweatshirt exhorts but does not itself further a specific illegal act. According to Turbak Berry herself, she is not, unlike Mayday's website, "encouraging a specific unlawful act" or "encouraging [a woman] to engage in illegality." TRANSCRIPT at 42/10, 42/15. Unlike Mayday's website, Turbak Berry and her sweatshirt admittedly are not "facilitating the sale of abortion pills." TRANSCRIPT at 45/7. But Mayday's website, unlike Turbak Berry's sweatshirt, instructs how (by mail), from whom (Aid Access *et al.*), and when (within a certain number of weeks post-LMP) illegal abortion drugs can be obtained. *Al-Timimi,* 2026 WL 71062 at *7-*9; *Arthur,* 160 F.4th 597 at 607. Thus, Turbak Berry's mere wearing of her Mayday sweatshirt is not in connection with transactional activity and, therefore, may not be and would not be prosecuted under SDCL 22-17-5.3.

*Conant, Hansen, Williams, Arthur* and *Al-Timimi* recognize a distinction between passive advocacy and actively providing the means to acquire contraband, but the district court could did not see any difference between Turbak Berry's sweatshirt and Mayday's website. As applied to Turbak Berry, these authorities hold that, so long as she "advertises" in the general sense of simply publishing her beliefs about abortion pill access via a message on her apparel, SDCL 22-17-5.3 does not

even apply to her and she can fearlessly wear her Mayday sweatshirt with all the blessings and protections the First Amendment allows. However, if she were to provide abortion pills to a woman while wearing her Mayday sweatshirt, the First Amendment protection her sweatshirt enjoys would not insulate her from criminal liability for the prohibited act of supplying an abortion "drug." *Arthur,* 160 F.4th at 607. Because Turbak Berry's claim that SDCL 22-17-5.3 criminalizes simply wearing a Mayday sweatshirt was not "realistic" or accurate, the district court erred in finding that she had standing and enjoining the statute as applied to her.

## III. The District Court Incorrectly Denied Defendants A Spoliation Remedy And Use Of Evidence Relevant To Mayday's Intent To Solicit And Facilitate Abort Drug Sales In South Dakota

As noted above, plaintiff Mayday deleted the Charley chatbot from its website on the eve of trial for the purpose of making this evidence unavailable to the defendants at trial. Defendants requested (R.DOC. 48) but were denied a mild spoliation remedy to address the prejudice of not having this evidence available for their defense.

### A. Background

In preparation for the hearing in this case, but after the filing of defendants' brief in response to the motion for preliminary injunction, defendants' counsel navigated through Chatbot Charley several times. Counsel found several quotes relevant to Mayday's intent that were then e-mailed to lead counsel, Amanda Miiller,

for inclusion in DCI Agent Kayla Klemann's affidavit and testimony. TRANSCRIPT at 228-231. Specifically, Chatbot Charley:

- Told women that "[a]bortion pills are available online in every state thanks to shield laws."
- Told women that "[i]t's not a crime in any state for people to get or use abortion pills for themselves before 24 weeks of pregnancy."
- Told women that abortion is "medically safe no matter how far along someone is in their pregnancy."
- Told women that "it's safe to take pills without seeing a provider first."
- Told women that abortion pills are "available to you."

R.DOC. 48-1/ADDENDUM 44. These quotes, promote and induce pill transactions by putting a woman at ease, mollifying her concerns about legality, safety and availability. These quotes, not the paraphrasings made necessary by Mayday's deletion of Chatbot Charley from the site, are the best evidence of Mayday's intent.

Counsel wanted these quotes to be photographed for evidence, as was done with other Chatbot Charley quotes before he was deleted. APP. 596-624, R.DOC. 45. However, when Miiller sought to photograph the additional quotes on Monday, June 22, 2026, Mayday had taken Chatbot Charley down. TRANSCRIPT at 117/14. Agent Klemann could then only paraphrase the quotes in question during her

testimony, which was inferior evidence to the actual quotes. TRANSCRIPT at 143-145.

For example, the Chatbot Charley quotes that "[a]bortion pills are available online in every state thanks to shield laws" and that "[i]t's not a crime in any state for people to get or use abortion pills for themselves before 24 weeks of pregnancy" were paraphrased as "it's not a crime for you to obtain or use abortion pills, that it can be shipped to all 50 states." TRANSCRIPT at 143/10. Missing from this paraphrasing is Mayday's representation that pills are available "in every state thanks to shield laws" and that its not a crime "in any state" to "get or use abortion pills." Due to the inferior evidentiary impact of the paraphrasings in comparison to actual quotes, defendants' defense has been prejudiced by Mayday's spoliation of the Charley chatbot on the eve of trial.

**B. Argument**

Whether Mayday's advertisements and website are speech integral to criminal conduct is the central issue of this case. Intent is an element of SDCL 22-17-5.1 and -5.3, and of solicitation and facilitation as well. Because Mayday repeatedly denied any intent to solicit or facilitate anything, the Charley Chatbot evidence was *more*, not less, relevant to the intent behind Mayday's advertising. TRANSCRIPT at 58/21, 59/4, 85/11, 86/2. Ol' Charley was deleted for being the overconfident member of the Mayday sales force who said the quiet part out loud.

At trial, Mayday argued that the Chatbot Charley evidence was irrelevant because he was "history," "no longer part of the website," and "completely gone" in an effort to persuade the district court to not admit any of it (which failed) or ignore it (which succeeded). TRANSCRIPT at 62/10, 62/19, 117/25, 118/12, 123/17, 248/18-23. Mayday deleted Chatbot Charley so that it could argue that the case should be decided "based on current circumstances on the website," that the "only facts the court could act upon [we]re the facts as they exist[ed]" on the day of the hearing. TRANSCRIPT at 62/10, 62/20.

But in litigation parties cannot unilaterally render computer-stored statements of intent irrelevant at the tap of the delete button. Fed.R.Civ.P. 37(e)(1). If a woman e-mailed a friend saying "I want to kill my husband" and he later dies under suspicious circumstances and the evidence points to her, that statement of intent would be admissible at her trial for murder. *United States v. Walker,* 60 Fed.Appx 637, 638 (8th Cir. 2003)(destroyed letter in which defendant expressed a hatred of intended murder victim relevant to intent). She could not magically render it "irrelevant" by deleting it from her computer the day before her trial.

Spoliation is "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, [usually] a document." *Jones v. Hirschbach Motor Lines*, 2022 WL 4354856, *2 (D.S.D. 2022), citing *Spoliation*, Black's Law Dictionary

(11th Ed. 2019). Such "intentional destruction of evidence indicating a desire to suppress the truth" is the "ultimate focus for imposing sanctions for spoliation of evidence." *Greyhound Bus Lines, Inc. v. Wade,* 485 F.3d 1032, 1035 (8th Cir. 2007).

Spoliation sanctions range from the restoration or replacement of the spoliated evidence on the mild end, to an adverse inference in the middle, to a default judgment against the spoliating party at the far end. Fed.R.Civ.P. 37(e). The degree of spoliation and the availability of a remedy to cure the resulting prejudice affect the severity of the remedy a court may impose. Severe sanctions are warranted when the spoliating party "acted with the intent to deprive another party of the information's use in the litigation" in question which, as mentioned above, Mayday admitted in open court was the purpose of taking Chatbot Charley down. Fed.R.Civ.P. 37(e)(2); TRANSCRIPT at 62/10, 62/19, 117/25, 123/17, 248/18-23.

Though a severe sanction might have been warranted, the defendants sought only the mildest sanction – either (1) the temporary restoration of Chatbot Charley as he existed in the days leading up to the trial so the state could photograph the quotes in question or (2) the court's admission of defendants' Exhibit JJ (R.DOC. 48-1/ADDENDUM 44), which was a short list of Chatbot Charley statements that were quoted verbatim in the defendants' briefing but which could not be photographed because Mayday had taken the chatbot down. Defendants did not ask the court to find Mayday in bad faith. Defendants did not even ask that the court

adopt inferences of intent or consciousness guilt, though such a sanction was arguably appropriate here. *White v. United States*, 959 F.3d 328, 331 (8th Cir. 2020)(adverse inference appropriate where there is evidence of (1) "intentional destruction indicating a desire to suppress the truth" and (2) "prejudice to the opposing party"); *Auer v. City of Minot,* 896 F.3d 854 (8th Cir. 2018)(adverse inference if party "acted with intent to deprive another party of information's use").

Per Fed.R.Civ.P. 37(e)(1), defendants need only demonstrate prejudice "from loss of the [spoliated] information" for a court to take appropriate measures "to cure the prejudice." More severe sanctions are reserved for bad faith spoliation, but, consistent with Fed.R.Civ.P. 37(e)(1), defendants sought a remedy that was "no greater than necessary to cure the prejudice."

A spoliation remedy was appropriate here when Mayday spoliated the Chatbot Charley evidence on the eve of trial for the openly admitted purpose of rendering the evidence "irrelevant," and so "prevent[ing] its use in [this] litigation." TRANSCRIPT at 62/10, 62/19, 117/25, 118/12, 123/17, 248/18-23; Fed.R.Civ.P. 37(e)(2) advisory committee notes to the 2015 amendment. But Chatbot Charley proves that Mayday's defense that it just "provides information" is a "big fake" (TRANSCRIPT at 98/21) when Charley took a woman through every step of

illegally acquiring and ingesting abortion pills short of handing her a glass of water to wash them down with. TRANSCRIPT at 121/25-123/6, 136-145; APP. 596-624, R.DOC. 45; R.DOC. 48-1/ADDENDUM 44.

The district court could not simply ignore the Chatbot Charley evidence because of Mayday's unilateral action in deleting him. *Jones*, 2022 WL 4354856 at *2. Chatbot Charley's deletion concealed overt statements of Mayday's intent but – as evidenced by the fact that its website is otherwise unchanged – deletion did not change Mayday's intent. The state defendants asked for no more than was necessary to cure the prejudice here. Fed.R.Civ.P. 37(e)(1). The district court abused its discretion in denying the defendants the mildest spoliation remedy.

**CONCLUSION**

Imagine placards in the state of South Dakota (or anywhere), at gas stations or grocery stores or other places in the public eye that read:

> ***They don't want you to know this:***
>
> **You can still get**
>
> **METHAMPHETAMINE**
>
> ***in all 50 states***
>
> **LEARN MORE AT METHDAY.HIGH**

Then imagine that the purveyor of this advertisement's website extolled the virtues of methamphetamine, mocked states for criminalizing it, concealed information about its risks, promised to provide it regardless of its illegality, told the public who

sells it and what it costs, and initiated mail-order drug transactions through links to out-of-state pushers. Could anyone seriously argue that such a racket would not illegally solicit and facilitate the sale of methamphetamine? Could anyone seriously argue that the First Amendment protected such a racket? The fact that the drug in question here is an abortion pill and not methamphetamine makes no difference; all that matters is that both drugs are illegal in South Dakota.

Mayday accuses the state of "targeting" it for its beliefs on abortion. APP. 58, 59, R.DOC. 1 at ¶¶ 28, 30; R.DOC. 4 at 3, 6, 8, 14, 18, 32. But one can look to the state's indifference toward groups who *legally* spread pro-abortion messaging in South Dakota to see that this is not true. TRANSCRIPT at 25/1-8. The Justice Empowerment Network (JEN), like the advertisement in *Bigelow,* informs South Dakota women where abortion is legal and even assists them with travel to states where it is legal. Unlike Mayday, so far as the Attorney General is aware, JEN does not promote abortion pill usage in South Dakota or provide links to abortion pill providers to mail abortion drugs into the state or otherwise propose or facilitate any activity within South Dakota's borders that is illegal in South Dakota. The South Dakota Attorney General has taken no steps to enjoin JEN's *Bigelow*-protected advocacy on behalf of legal, out-of-state abortions. TRANSCRIPT at 25/1-8. Unlike JEN, Mayday's activity is not *Bigelow* protected. There is zero evidence that

the Attorney General has sought to enforce SDCL 22-17-5.3 against Mayday in bad faith or for any purpose of harassment. *Younger,* 401 U.S. at 53-54.

Mayday has been "targeted" because Mayday alone solicits women and abortion drug merchants to violate SDCL 22-17-5.1 and -5.3 with the intent to disseminate, distribute and/or sell abortion drugs to produce an abortion in the state of South Dakota in violation of SDCL 22-4A-1. Mayday alone aids and abets women and abortion drug merchants in planning and committing the crimes of disseminating, distributing and/or selling abortion drugs to produce an abortion in the state of South Dakota in violation of SDCL 22-3-3. Mayday is not "targeted" because of some thoughtcrime stemming from its moral convictions, but because of its "in-your-face" solicitation and facilitation of illegal drug transactions and illegal abortions within South Dakota's borders. APP. 203, R.DOC. 16-3. If Mayday had its way, it would stage "pop-up abortion stores" and plaster its message on gas pump placards, semi-tractor trailers, airplane banners, billboards and any other surface it could commandeer. TRANSCRIPT at 64/16, 94/23, 113/19; APP. 594, R.DOC. 45.

The district court's injunction order defies controlling, on-point United States Supreme Court and 8th Circuit authorities. *Pittsburgh Press* and *Bigelow* could not be clearer that there is no First Amendment protection for advertising illegal drugs or abortions. *Jackson, Hernandez* and *Anziano,* are equally clear that Mayday personally need not "sell, handle, provide, offer for sale, or distribute" abortion drugs

to be guilty of solicitation and facilitation. Many crimes can be committed without a solicitor or aider and abettor thereof getting his own hands dirty.

This court need only find that Mayday's "advertising" is integral to the commission of crimes in South Dakota to find that it solicits in violation of SDCL 22-4A-1 and aids and abets in violation of SDCL 22-3-3 and so is altogether unprotected. For this, this court need look no further than the Giebink testimony to find proof of Mayday's integral role in importing abortion drugs into South Dakota. TRANSCRIPT at 180/15, 184/21, 188/13, 193/11, 194/2, 194/6-195/8, 199/14, 200/12; APP. 223-224, R.DOC.16-2 at ¶ 25.a-h. Indeed, according to the American Medical Association, Aid Access, no doubt largely via Mayday's website, has shipped hundreds of abortion pills into South Dakota. TRANSCRIPT at 198/1, 199/8-19; *Telemedicine Under Shield Laws in the US*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 2025;334;(15):1388-1390.doi:10.1001/ jama.2026.11420, APP. 699, R.DOC. 45.

Because Mayday's advertising is speech integral to illegal drug trafficking by its website, Mayday cannot possibly succeed on the merits of its First Amendment claim. Based on the record here and applicable law, the district court's order preliminarily enjoining the state's enforcement of SDCL 22-17-5.1 and -5.3, and applying the statute to Turbak Berry, must be reversed. Further, the district court's

order suppressing evidence that Mayday spoliated must also be reversed so that this evidence may be available to the defendants in the trial of this case.

Dated this 9th day of October 2026.

Respectfully submitted,

**MARTY J. JACKLEY**
**ATTORNEY GENERAL**
**STATE OF SOUTH DAKOTA**

/s/ *Paul S. Swedlund*

Paul S. Swedlund
SOLICITOR GENERAL
Amanda J. Miiller
DEPUTY ATTORNEY GENERAL
Jacob R. Dempsey
ASSISTANT ATTORNEY GENERAL
1302 East Highway 1889, Suite 1
Pierre, SD 57501
605-773-3215
paul.swedlund@state.sd.us

## CERTIFICATE OF COMPLIANCE

Appellants Larry R. Rhoden, *et al.*, by and through their counsel, Paul S. Swedlund, hereby certify that this document complies with the type/volume limit of Fed.R.App.P. 32(a)(7)(b) and this court's order granting leave to file an overlength brief. It contains 12,985 words. It complies with the typeface and type style requirements of Fed.R.App.P. 32(a)(5)/(a)(6) in that it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font. It has been scanned for viruses using Symantic Endpoint Protection.

/s/ *Paul S. Swedlund*
Paul S. Swedlund
SOLICITOR GENERAL

## CERTIFICATE OF SERVICE

Appellants, Larry R. Rhoden, *et al.*, by and through their counsel, Paul S. Swedlund, hereby certify that appellants' brief and appendix was served on appellant's counsel, James D. Leach, via the court's CM/ECF filing system this 9th day of October 2026.

/s/ *Paul S. Swedlund*
Paul S. Swedlund
SOLICITOR GENERAL